LILLIAN OGLESBY, Administratrix of Estate of ERNEST E. OGLESBY, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—1 S. W. (2d) 172.

Division One, October 10, 1927.

*E. T. Miller, Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

*P. H. Jackson, Harry R. Freeman* and *Madden & Madden* for respondent.

GRAVES, P. J.—By a reassignment this case has fallen to me. It is an action for damages under the Federal Employers' Liability Act for the alleged negligent killing of Ernest E. Oglesby by the (defendant below) appellant Railway Company. The action is brought by his widow, as the duly appointed administratrix of Oglesby's estate. After some formal allegations the petition charges:

"Plaintiff further states that on or about the 23rd day of June, 1921, Ernest E. Oglesby, deceased, was in the employ and service of the defendant as an electrician at said shops in Kansas City, Missouri, and was engaged with other employees of defendant in repairing an engine which was used and assigned to the work of carrying on commerce between States, and to pulling interstate trains and in doing repair work deceased and defendant were engaged in commerce between States.

"At the above-mentioned time said Ernest E. Oglesby was operating an electric welding machine and had entered the dome of said engine to weld parts of said engine that were cracked and broken; that the space was so small deceased was required to lie down upon the metal parts which were wet and charged with electricity and while engaged in said work through and by the negligence of the defendant an electric current was caused or permitted to pass through deceased's body, shocking, burning and injuring him to such an extent that he died on said date as a direct result of said injuries.

"Plaintiff further states that the defendant was negligent in that it failed to furnish deceased with a safe instrumentality with which to work because said welding machine was defectively put together, in that it was not provided with an automatic contactor and the wires in said machine were short circuited which caused the electric current when turned on and not in the actual operation of welding to be high, excessive and dangerous to persons operating said machine, and that defendant knew, or in the exercise of ordinary care could have known, that said machine was in such defective and unsafe condition and of the likelihood of the operator coming in contact with the current, especially in the place where deceased was required to work and of the danger to said operator, in time before the death of deceased to have remedied said defects and thereby have prevented his injuries and death; in that said defendant with the knowledge of conditions and dangers as aforesaid, negligently failed to warn deceased of his danger; in that with the knowledge of conditions and dangers as aforesaid it negligently ordered and directed him to do said work, and in that defendant failed to furnish deceased with a safe place in which to work because defendant with the knowledge of

conditions and dangers as aforesaid negligently required deceased to enter the dome of said engine in the small space and lie down upon the wet parts thereof and operate said defective machine as aforesaid and that each and all of said negligent acts directly caused the injuries and death of Ernest E. Oglesby.''

Thus is stated the alleged negligence. The submission was upon one ground only, as will be noted later. The suit is for the benefit of the widow and a sixteen-year-old son, both alleged to have been dependent upon deceased. We mean that they are the sole beneficiaries, as stated in the petition. The damages asked was $50,000.

The answer is (1) a general denial, (2) assumption of risks, and (3) contributory negligence of deceased. Reply is a general denial. Such are the pleadings. Upon trial before a jury, a verdict for $25,000 was returned, and upon this judgment was entered. From this judgment this appeal is taken.

The assignments of error are only six in number, with some duplications. The assignments are thus stated:

''1. The court erred in refusing the instruction requested by defendant at the close of plaintiff's testimony requiring the jury to find for defendant.·

''2. The court erred in refusing the instruction requested by defendant at the close of all the evidence requiring the jury to find for defendant.

''3. The court erred in giving instructions asked by plaintiff and giving each and every one of said instructions.

''4. The court erred in giving Instruction No. 2 requested by the plaintiff.

''5. The court erred in refusing to set aside the verdict as excessive.

''6. The court erred in failing to require a *remittitur* for the reason that the verdict is excessive.''

It will be seen that number 3 covers number 4, and that number 5 covers number 6. Of the points made (five only), three of them go to the refusal of the court to give a demurrer to the evidence: (1) because the evidence failed to show that deceased was injured in interstate commerce, (2) because the evidence fails to show that deceased's injury and death were caused by negligence of which defendant was charged in the petition or which was submitted to the jury, and (3) because under the evidence deceased assumed the risk of injury. The fourth point attacks plaintiff's Instruction 2, only, and the fifth and last urges that the verdict is excessive. Defendant asked no instructions other than demurrers to the evidence. The foregoing is a full general outline of the case. Details of the evidence are left to the opinion.

I.  Both at the close of the plaintiff's case and at the close of the whole case, the defendant asked instructions in the nature of demurrers to the evidence in behalf of plaintiff.  These instructions, it is stated, should have been given for three reasons, which reasons we have outlined in our statement.  Each will be considered in connection with the pertinent facts.

(a)  The first contention is that: "The court should have directed a verdict for the defendant because the evidence failed to show that the deceased was engaged in interstate commerce."  This is a call for the facts.

Defendant had in Kansas City, Missouri, a roundhouse, and also near the roundhouse a general repair shop.  Defendant had two lines of railroad running out of Kansas City, one of which was interstate and the other purely intrastate.  Engines from both roads were repaired at this roundhouse and repair shop.  There are two classes of repairs.  Taking the testimony more favorable to plaintiff, which it is our duty to do, in passing upon a demurrer to the testimony, we find that there were what is called "running repairs," which included "light repairs to machinery and boiler work," which were made in the roundhouse under the supervision of the roundhouse foreman, who was a Mr. Medford at the time involved in this suit.  Then they had what they called "classified repairs," which were made in the repair shop back of the roundhouse.  These repairs were more extensive and heavier than "running repairs" and required more time.  They were in charge of a different crew of men.  The engine involved in this case was Engine No. 668.

Learned counsel for appellant in their brief say: "In the first place, it appeared that the engine upon which deceased was working had been regularly used in interstate commerce up until three days before deceased's injury; that it was then withdrawn from the service for repairs, and remained out of the service undergoing repairs, of which the work deceased was performing was a part, for twenty-nine days; that it was then returned to service and again regularly used in interstate commerce. *The engine was of a type used only upon defendant's interstate line and while in service it was assigned only to use in interstate commerce.*"  (The italics above are ours.)

This engine was left in the roundhouse for repairs on June 20th, with a notation that it would require ten days to make the repairs.  On the 23rd day of June, deceased, who was an electric welder, was working upon this engine and was electrocuted and killed in the use of an electric welder.  Note that his death was within the ten-day period indicated for the repairs.  Note also that the repairs then in mind were "running repairs" or "light repairs and boiler work," because the engine was retained in the roundhouse for the making of the repairs, rather than sent to the repair shop for heavy

repairs. Oglesby was killed while doing some electric welding (a part of the repairs) in the engine, on the 23rd day of June. Welding (by successor to Oglesby) was not resumed until the first day of July. This was one day after the time originally fixed to put the engine back into service. This, of course, was an estimated date for resumption of service, but was made after inspection of the engine. This date remained on the roundhouse book until June 29th, when the estimated date of return to service was changed to July 15th. At this time more extended repairs were ordered made. The engine actually resumed its interstate work on July 19th. It was taken out of interstate service on June 20th for light repairs, estimated to keep it out of service for ten days. Three days later Oglesby was killed while making some of these repairs, and another electric welder was not employed until about a week after Oglesby's death, and he took up Oglesby's unfinished work on July 1st. In the *interim* more extended repairs were ordered (June 29th), and the estimated date of the engine's return to work in interstate commerce was changed to July 15th, and it actually went back into the same service on July 19th. From these facts must be judged whether or not Oglesby was engaged in interstate commerce at the time of his unfortunate death. It must be remembered, however, that the interstate engine came into the roundhouse on June 20th, and it was estimated that it would take ten days for the repairs to be made in the roundhouse, and that on June 23rd Oglesby was killed. Later more extensive repairs were ordered on the engine, and its date of departure from the shop was run up to July 15th instead of June 30th, the date fixed at the time of its entry into the roundhouse for repairs. Changes ordered after Oglesby's death cannot affect this case. In other words the status of Oglesby must be determined by the facts which existed before and at the time of his death, and not by matters arising thereafter.

The United States Supreme Court has left the facts of each case to determine the status of the servant (as to whether engaged in interstate commerce or otherwise) at the time of injury. It has declined to undertake to announce a fixed rule. [Industrial Commission v. Davis, 259 U. S. l. c. 188—last paragraph of the opinion.]

The Supreme Court has, however, announced a test which has been and is generally recognized. That test is, ''Was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it.'' [Shanks v. Del. Lack. & West. Railroad, 239 U. S. l. c. 558; C. B. & Q. Railroad Co. v. Harrington, 241 U. S. 177; Southern Pacific Co. v. Industrial Accident Comm., 251 U. S. 259; Industrial Commission v. Davis, 259 U. S. l. c. 185.]

In the last-named case above (259 U. S. at page 187) Mr. Justice McKENNA does add some very material things to the simple test announced in the Shanks case, supra, when he says:

"The Federal act gives redress only for injuries received in interstate commerce. But how determine the commerce? Commerce is movement, and the work and general repair shops of a railroad, and those employed in them, are accessories to that movement, indeed, are necessary to it, but so are all attached to the railroad company, official, clerical or mechanical. *Against such a broad generalization of relation we, however, may instantly pronounce, and successive'y against lesser ones, until we come to the relation of the employment to the actual operation of the instrumentalities for a distinction between commerce and no commerce. In other words, we are brought to a consideration of degrees,* and the test declared, that the employee at the time of the injury must be engaged in interstate transportation or in work so closely related to it as to be practically a part of it, in order to displace state jurisdiction and make applicable the Federal act. *And there is a difference in the instrumentalities. In some, the tracks, bridges and roadbed and equipment in actual use, may be said to have definite character and give it to those employed upon them.* But equipment *out of use, withdrawn for repairs, may or may not partake of that character according to circumstances,* and among the circumstances *is the time taken for repairs—the duration of the withdrawal from use.* Illustrations readily occur. There may be only a placement *upon a sidetrack or in a roundhouse—*the interruption of actual use, and the return to it, *being of varying lengths of time, or there may be a removal to the repair and construction shops, a definite withdrawal from service and placement in new relations;* the relations of a work shop, its employments and employees having cause in the movements that constitute commerce but not being immediate to it.

"*And it is this separation that gives character to the employment, as we have said, as being in or not in commerce.* Such, we think, was the situation of the engine in the present case. It was placed in the *shop for general repairs on* December 19, 1918. On February 25, 1919, after work upon it, it was given a trial and it was placed in service on March 4, 1919. The accident occurred on February 1st of that year, the engine at the *time being nearly stripped and dismantled.* 'It was not interrupted in an interstate haul to be repaired and go on.' [Minneapolis & St. Louis Railroad Co. v. Winters, 242 U. S. 353, 356; Chicago, Kalamazoo & Saginaw Ry. Co. v. Kindlesparker, 246 U. S. 657.]"

We start our determination of the question with the admission of counsel for appellant that: "The engine was of a type used *only* upon defendant's interstate line and while in service it was assigned *only* to use in interstate commerce." Thus the interstate characteristic and use of the instrumentality is firmly fixed. The instrumentality (the engine) was one used only in interstate commerce.

If taken out for repairs it was to be returned to this use. This admission distinguishes this case from most cases we have read, and from all that are relied upon by appellant, and we have carefully read them. It shows that this instrumentality was one not only used solely in interstate commerce, but also its adaptability for such use, and the further fact of the fixed purpose to return it to such use after the intermission expired. Under the rule announced in this case (Industrial Accident Commission v. Davis) a case was made for the plaintiff in the present case. Within three days of the placing of the engine in the roundhouse for ''running repairs,'' the husband of plaintiff was killed. The engine was temporarily there for light repairs and return to interstate commerce in ten days—June 30th. This Davis case is the very latest expression of our Federal Supreme Court, and under the rule there announced (which rule we have quoted fully above) the deceased was engaged in interstate commerce when killed.

Note some of the language of Mr. Justice McKenna (259 U. S. 1. c. 187) in the Davis case, supra. In addition to the admitted fact, that this engine was an interstate commerce instrumentality, which under the rule is of vital importance, duration of the withdrawal from actual use is a fact to be considered. Further the character of and the place of making the repairs are material. This case (259 U. S. 1. c. 187 and 188) recognizes a difference between ''running repairs'' of a light character, made in the roundhouse, and a general overhauling of the engine in a regular repair shop. In the first instance the engine is in the same hands as when on its regular runs. Often light repairs are made in the roundhouse between the regular runs of the engine. But the opinion indicates that when the engine is sent to a repair shop for classified or heavy repairs, it is placed in new hands and under the control of a crew more distantly separated from the actual transportation work in interstate commerce, and thus indicating a withdrawal of the instrumentality from interstate commerce. This Davis case determines the case at bar and determines it in favor of the plaintiff, so far as the action being properly brought under the Federal act.

The demurrer was properly overruled upon the ground first urged, supra, by the appellant.

(b) It is in the second place urged that: ''The court should have directed a verdict for defendant because the evidence fails to show that deceased's injury and death were caused by negligence of which defendant was charged by petition or which was submitted to the jury.'' We have suggested, supra, that the submission of the issues was not as broad as the petition. We have stated the negligence pleaded. The submission is by plaintiff's Instruction No. 2, which reads:

"The court instructs the jury that if you believe and find from the evidence that the defendant at the time and place deceased met with his death, was engaged in commerce between states as defined in Instruction 1; and if you further believe and find from the evidence that the deceased while operating the electric welding machine mentioned in evidence in welding certain parts of engine 668, was shocked and injured by the electric current from said machine and that as a direct result of said injury he was killed; and if you further believe and find from the evidence that said electric welding machine was not equipped with an automatic contactor and that without such contactor the operator was in danger of being shocked and injured, and if you further believe and find from the evidence that the defendant knew, or in the exercise of ordinary care could have known, of such danger (if any) and that said automatic contactor was in general use and in the exercise of such care defendant could have procured and used such contactor and that it was reasonably practicable to apply and use the same on the machine in question; and if you further believe and find from the evidence that by the use of said contactor the danger of shock and injury to the operator would be prevented and avoided and that the defendant failed to exercise ordinary care to provide said contactor (if you so find), *then the defendant was guilty of negligence;* and if you further believe and find from the evidence that the death of the deceased was the direct result of said negligence then your verdict should be in favor of the plaintiff, providing you further find that the deceased did not know or assume the risk of being injured by using said machine without said contactor."

The failure to have the welding machine equipped with an automatic contactor is the sole ground of negligence submitted. This failure was duly pleaded as one of the grounds of negligence, and the petition concludes in this language, "and that *each* and all of said negligent acts directly caused the injuries and death of Ernest E. Oglesby." So it appears that this alleged negligent act was not only pleaded, but pleaded (as seen by the concluding sentence of the petition, supra) as a *causal* act of negligence. Thus we have an act of negligence duly pleaded as a *causal* act of negligence, and the same act of negligence duly submitted to the jury. To us it appears that we have only to search the evidence for the proof of the negligent act, and that it caused the death. It was difficult, at first glance at the contention, to gather the force of the contention really made. Going to the argument the position of the learned counsel is made clearer. It is not contended that there is no evidence from which the jury could have found that the failure to have a contactor on the welding machine was negligence upon the part of the defendant. The contention is that the evidence fails to show that the absence of the contactor was the cause

of the death. In other words, that the evidence does not disclose whether death occurred while the process of welding was going on, or whether it occurred when deceased was not actually welding. It might be well to give the contention from the argument. The following paragraph will suffice:

"While there was evidence tending to show that an automatic contactor, had it been attached to the machine in question, would have served the purpose of reducing the voltage of electricity passing to the electrode holder from 110 volts, which was used in welding, to thirty volts, when the welding operation was not in progress, it was not disclosed by the evidence whether deceased received a shock while the process of welding was in progress or while it was interrupted. If he received it while the process was in progress the absence of the contactor was immaterial and no actionable negligence was charged.

"The evidence showed that the field, to-wit, the engine upon the metal parts of which deceased was lying, was charged with a current of 110 volts and that the electrode holder with the jaws and trigger of uninsulated iron carried the same voltage for the doing of the work of welding."

Again we are forced to go to the evidence. Deceased was welding cracks in the boiler of the engine. McRea who followed him finished up the job and welded a couple of cracks in the fire box. McRea was an experienced welder, but at that time he did not use the machine with which deceased worked. He did later. He was familiar with welding machines, and the safety device known as contactor. From him we get the description of a welding machine and this contactor. Connected with the welding machine is a transformer box, and in this box the voltage of electricity is reduced from 440 to 110 or 115, the amount used in welding. In this transformer box is also placed the contactor, and by it the current is reduced to thirty volts until such time as the process of welding begins. This voltage (thirty volts) is shown to be absolutely harmless. Without the contactor there would be a voltage of 110 or 115 at all times. Before the process of welding begins a steel electrode is put in the jaws of the welding machine. This is done by pressing an uninsulated iron trigger on one jaw of the machine, but at this time the contactor (safety device) holds the voltage at thirty volts, and there is no danger. Without the contactor the full current to be used in welding would be on all the time. There is a non-conducting wooden handle on these jaws, so after the electrode is placed, the operator uses this, and has no voltage when contact is made by the electrode and the metal to be welded. The non-insulated trigger was only used while placing the electrode (a fourteen-inch steel wire) in the jaws, and with the contactor on, there would be but thirty volts during this process. When

the electrode contact is made, then the full welding current is on, but the resistance is such that it does not affect the man holding the electrode to the metal to be welded. Thus, McRea says:

"Q. The full current of this welding process is how much? A. Well, I couldn't say, but I don't believe over 115 or 120; that is a mere estimation.

"Q. Now, when a man is holding this handle in his hand, before he makes the contact, then is the contactor on or off? A. It is off.

"Q. It is off, that is, the current is off? A. All excepting this thirty volts.

"Q. The thirty volts? What effect does it have when the operator of this handle has his thumb on this metallic trigger? A. None.

"Q. That does not make any difference? A. No, sir.

"Q. And the time he puts his thumb on that trigger is when he is putting in one of these electrodes, is that right? A. Yes, sir.

"Q. And when he gets the electrode in he releases his thumb; that is the ordinary operation, is it? A. Yes, sir.

"Q. Now, until he makes the contact with the electrode in the process of welding, the thirty volts are on? A. Yes, sir.

"Q. And then as soon as he makes the contact this full circuit of 110 or 115 volts is used? A. Yes, sir."

Further on he says:

"Q. Mr. Madden has asked you about this current when the automatic contactor is not on it, or when it is on it, for that matter—if I understand this situation correctly, when you apply the electrode holder to the engine, or rather apply the electrode that is in the electrode holder to the engine, your voltage goes down to pretty near nothing, doesn't it? A. Yes, sir.

"Q. Immediately by that contact being made? A. Yes, sir."

Lastly this witness says:

"Q. Judge GUTHRIE asked, As soon as you made the contact in this welding process then the voltage goes down? A. Yes, sir.

"Q. That is because of the resistance of the work that is being done? A. Yes, sir.

"Q. That is always the case, is it not? A. Yes, sir.

"Q. Then you have the highest voltage in that circuit there if you are not making any application at all, if you are not doing any work, without a contactor? A. Well, you have the same that you would be using, about 100.

"Q. 110 or 115, you say? A. Something."

So there is evidence from which a jury could find that deceased was not actually welding at the time he received the fatal shock, but that it occurred when he was not welding. Had there been a contactor there would have been but thirty volts when not welding. Without the contactor, the time when deceased was not welding is the

only time when there would be a full voltage, under the foregoing evidence. The plaintiff is entitled to all legitimate inferences which can be drawn from the facts in evidence.

The facts do not sustain the second contention of counsel as to why their demurrer to the evidence should have been sustained.

(c) Thirdly it is said: "The court should have directed verdict for defendant because under the evidence deceased assumed the risk of injury." The answer pleads only the ordinary risks, thus:

"Further answering, defendant states that if deceased was injured and lost his life at the time and in the manner alleged in plaintiff's petition, that his injury and death was caused by the ordinary risks of his employment, which were at all times assumed by deceased. Wherefore, defendant asks to be dismissed with its costs."

The risk in this case was one occasioned by the negligence of the defendant and in this it might be said was not one of the ordinary risks of the employment, but of this later, if necessary.

The matter of assumption of risk was submitted to the jury in plaintiff's second instruction, and the jury found against the defendant upon the facts. So, unless as a matter of law, we should declare that deceased assumed the risk of defendant's failure to have a contactor in this transformer box, then defendant's contention must be overruled. It must be borne in mind that this little safety device should have been in the enclosed transformer box. It could not be open and visible, but would be enclosed and hidden, if there at all. And more than this, it was under the control of the electrician and not under the control of the welder. The welder had nothing to do with it at all. Such is the evidence.

We need not go into great detail in ruling this question. Our court has gone over the question quite recently in McIntyre v. Frisco Railway, 286 Mo. l. c. 256 et seq. In that case WHITE, J. (then WHITE, C.), says:

"The Federal courts in cases arising under the Federal Employers' Liability Act hold that an employee in entering upon a contract of employment assumes all the risks and dangers ordinarily incident to his employment; and risks caused by the employer's negligence which are obvious and fully known to the employee and appreciated by him, or so plainly observable that he must be presumed to know them. [Boldt v. Railroad, 245 U. S. l. c. 444; Southern Ry. Co. v. Crockett, 234 U. S. l. c. 730; Chesapeake & Ohio Ry. Co. v. Proffitt, 241 U. S. l. c. 468; Pryor v. Williams, U. S. Sup. Ct. Advance Opinions for Dec. 1, 1920, p. 12, reversing Williams v. Pryor, 200 S. W. (Mo.) 53.] But he is not obliged to use even ordinary care in discovering dangerous defects. Knowledge will not be imputed to him unless the

defects are plainly observable. [Texas & P. Ry. v. Archibald, 170 U. S. 665; Railroad v. McDade, 191 U. S. 64; Ry. Co. v. Shalstrom, 45 L. R. A. (N. S.) l. c. 390.]''

Note that the Federal rule includes two classes of risks, i. e. (1) those ordinarily incident to his employment, and (2) ''risks caused by the employer's negligence which are obvious and fully known to the employee and appreciated by him, or so plainly observable that he must be presumed to know them.''

The defense in this case is urging that the deceased assumed the risk of the negligent failure of the master to have a contactor in the transformer box. A question or two solves this issue in the case. Whose duty was it to show deceased had actual knowledge of the defective apparatus by reason of not having a contactor in the transformer box? Did plaintiff have to prove a negative, or was it the defendant's duty to show that deceased had knowledge of its negligent act, and fully appreciated the risk and danger to him arising therefrom? Clearly the latter. Defendant tried to make no such proof, nor was it made at all, so far as this record shows. This eliminates this contention as a reason for giving the demurrer to plaintiff's evidence. ''To defeat an action by the defense of assumption·of risk, the employer must show not only that the servant knew of the negligence of which he complains, but that he *knew and understood, or ought to have known and appreciated* the increased danger to which he voluntarily exposed himself. There is a *distinction* between knowledge of defects or knowledge of alleged negligent acts, *and knowledge of the risks resulting from such defects or acts.*'' [National Steel Co. v. Hore, 155 Fed. l. c. 65.] The foregoing was quoted with approval in McIntyre v. Frisco Railway, supra, 286 Mo. l. c. 257. It suffices to say that defendant made no attempt to make the proof, which would entitle it to invoke this particular doctrine of assumption of risk. We mean assumption of a risk created by the negligence of the master.

From it all it appears that the demurrer to plaintiff's evidence was properly overruled.

II. In the fourth point of the appellant's brief plaintiff's Instruction 2 is attacked. This instruction we have set out in full, supra, and italicized the clause, *''then the defendant was guilty of negligence.''* This clause follows the enumeration of a number of facts which the instruction required the jury to find. In short this instruction says to the jury, ''if you find these enumerated facts, to be the facts shown by the evidence,'' then such facts show the defendant guilty of negligence and upon that issue (issue of negligence or no negligence) you must find for the plaintiff. In other words, the court simply says these enumerated

facts show negligence as a matter of law, and if you find the facts to be as enumerated, then the defendant (as a matter of law) is guilty of negligence.

Two things may be considered in ruling upon this instruction. In the first place the omission of a requirement therein asking the jury to say whether or not these enumerated facts show negligence upon the part of the defendant is a harmless omission, because no jury would find all these enumerated facts to be the real facts of the case, and then say they do not show negligence. We do not say that the omission was error (we say just the contrary), but what we do say now is, that even if it was error, it was harmless, and did not hurt the defendant. At this we might let the matter rest, but we shall not.

In ordinary cases the courts can declare that certain enumerated facts show either negligence as a matter of law, or contributory negligence as a matter of law. Division One has recently gone over this matter. [Hastey v. Kaime, 317 Mo. 1010, 297 S. W. 50.] It had been ruled before, however. Speaking to the very point, BLAIR, J., for our Court en Banc, in the case of State ex rel. v. Ellison, 223 S. W. l. c. 674, said:

"It is urged Instruction 4 did not require a finding that facts predicated in it constituted negligence. It is sufficient to say that under the rule announced in Corby v. Telephone Co., supra, the facts predicated, if found, constituted negligence as a matter of law, and, in such circumstances, it is not necessary to require the jury to add to its finding of the facts an additional finding that such facts constitute negligence. The law draws the conclusion in such cases."

As suggested in Corby v. Tel. Co., 231 Mo. 417, has a like ruling. Instruction 2 in that case was approved. It in substance is like the one here. [See 231 Mo. l. c. 428.] So too, long years ago, the identical question was passed upon by Division One, speaking through MACFARLANE, J., in Fullerton v. Fordyce, 144 Mo. l. c. 528 et seq.

These cases announce a general rule along the line of that stated in the Ellison case, supra, which we have quoted. In the Fordyce case, supra, we said:

"The facts in this case stand virtually admitted by the evidence of defendant's employees and are disputed by no witness. The simple question then is, whether defendants were guilty of negligence, as a matter of law, in leaving for four days, unguarded and unlighted, a hole, of the character described, in their station platform, which was about four feet above the ground and over which passengers were required to pass on leaving trains. We thought they were on the first hearing, and we are still of the same opinion. Defendants owed to the public the duty of keeping their platform in a reasonably safe condition. A failure to perform this duty was negligence. That the duty was not performed stands virtually admitted. It was said in

the James case, supra, that the court could not assume 'that it is negligence to permit a hole to remain in a railroad station platform.' The decision must be interpreted in the light of the facts upon which it was rendered. The 'hole' the court had in mind was made with an auger and was only from one and a half to two inches in diameter, while the 'hole' the court had in mind in this case was eight inches wide and six feet long. Under the facts in the former case it was questionable whether the platform was not in a reasonably safe condition for the uses to which it was ordinarily applied; in the case at bar the dangerous condition of the platform is apparent to any reasonable mind. Defendants were undoubtedly entitled to a reasonable time in which to repair the platform and put it in a reasonably safe condition. What would be a reasonable time in any case will depend upon the character of the required work. Defendant's agents caused the defect and knew of its existence for at least four days before the accident. This was ample time in which to have made the trifling repairs necessary. The defect was dangerous and threatened every passenger who left the train, and due care required, at least, some kind of warning to them of the danger. None whatever was given, though the train upon which plaintiff was a passenger arrived in the nighttime. In the circumstances the negligence of defendants could properly have been declared as a matter of law."

If the case we have in hand is not different from the cases, supra, then there was no error in Instruction 2. Like the Fordyce case the evidence comes from defendant's employees, and is not disputed. All the court does is to say to the jury: if you find these facts, then there is negligence.

Appellant seems to have had this rule in view, so in his Point IV he lodges his complaint in this language:

"The court erred in giving plaintiff's Instruction 2.

"(a) In that the instruction made of defendant an insurer of deceased's safety, set up an arbitrary standard of duty, and required defendant to furnish a particular appliance without requiring the jury to find that the exercise of ordinary care required that such appliance be furnished.

"(b) In that it assumed that an automatic contactor was in general use."

The last objection is easily answered by a mere reading of the instruction. The instruction did not assume that an automatic contactor was in general use. It specifically required the jury to find that fact. On this point the instruction reads: "and if you further believe and find from the evidence that said electric welding machine was not equipped with an automatic contactor and that without such contactor the operator was in danger of being shocked and injured, *and if you further believe and find from the evidence* that the defendant knew, or in the exercise of ordinary care could have known,

of such danger (if any) *and that said automatic contactor was in general use* and in the exercise of such care defendant could have procured and used such contactor and that it was reasonably practicable to apply and use the same on the machine in question; and if you further believe and find from the evidence that by the use of said contactor the danger of shock and injury to the operator would be prevented and avoided and that the defendant failed to exercise ordinary care to provide said contactor (if you so find), then the defendant was guilty of negligence.'' The instruction is not as clear as it might be, but this objection to it is a mere play upon words. If there were a comma after the words ''(if any)'' there would be no room for question. We take it (although counsel deal only in general terms) that they contend the instruction only required the jury to find that the defendant *knew* the automatic contactor was in general use. Even if this were true (which we do not concede) the jury could not well find that defendant knew it to be in general use, without finding that it was, in fact, in general use. We shall not waste further time on this contention.

Going to the objection in paragraph (a) of the objection to the instruction, supra, it is said the jury was not required to find that the exercise of ordinary care required the defendant to equip its machine with an automatic contactor. The instruction does so require in the use of the words, ''and that the defendant failed to exercise ordinary care to provide said contactor.'' This instruction does not make defendant an insurer of the safety of his employee, nor does it set up an arbitrary standard of duty. The jury was required to find ''that the defendant failed to exercise ordinary care to provide said contactor.'' The standard of duty fixed is therefore the exercise of ordinary care. This is the standard of duty that the law fixes, i. e. that the master must exercise ordinary care to supply the servant with reasonably safe instruments with which to do his work. Such a standard is not an arbitrary standard, but the standard fixed by the law; nor does such a standard make the master an insurer of the safety of the servant. If the exercise of ordinary care requires the furnishing of a particular safety device or appliance in order to make the instrumentality reasonably safe for use then it must be furnished, or the master is negligent. We have just demonstrated that the instruction did require the jury to find that the exercise of ordinary care did require this particular device to be furnished. No other kind of a device was shown to exist.

Appellant must realize that it was using, or having used, a deadly current of electricity. We use the word deadly in the sense that electricity is dangerous and hazardous. Ordinary care must be measured by the surrounding conditions. The welder had to use this machine at all seasons, and under varying circumstances. Some-

times there would be dampness in the engine boiler. Sometimes this hot weather caused the workman's clothes to become wet with sweat. McRea says that the conditions might be such that one would receive quite a shock from thirty volts of electricity. All these things bear upon what was ordinary care. We do not object to the rule that says the employer is not bound to furnish the latest or best appliances. Grant it that the usual and ordinary way adopted by those employed in the same business is the test, yet in this case this instruction required the jury to find, and by their verdict the jury did find, that this "automatic contactor was in general use." So that this very test suggested by appellant was made by this instruction. In fact an instruction which pointed out the particular appliance which defendant should have used, has been upheld by this court. [Curtis v. McNair, 173 Mo. l. c. 287, et seq. and especially l. c. 289.] This Instruction 2 enumerates facts which if found by the jury made it a failure to exercise ordinary care not to use this device. This case is peculiar. The only actual defense made by evidence for defendant is that deceased was not engaged in interstate commerce. Appellant made no effort to show that the instrumentality it used in welding was one in general use, either without or with this safety device. What was not invoked as a defense to plaintiff's charge of negligence cannot require a great amount of consideration here. Under all the facts of this case the instruction was well enough, and at least not harmful.

III. Lastly it is contended that the verdict and judgment is excessive. This judgment is for $25,000. In view of our more recent rulings in cases under the Federal law (such as the case at bar), there is no foundation for this contention. [Crecelius v. Ry. Co., 284 Mo. 26; Gill v. Railway Co., 302 Mo. 317; Kidd v. Ry. Co., 274 S. W. 1079.]

The deceased and wife were both about thirty-five years old. There was just three months difference in their ages, so their expectancies were about the same. He was earning at time of his death $200 per month, and these earnings he brought home to his family. The family was made up of himself, his wife and a son sixteen years of age, when the father was killed.

In the Crecelius case, supra, we affirmed a judgment for $15,000, where the deceased was thirty-four years old, but earning only $52 per month, with some prospects of advancement. However in that case, the deceased was confessedly guilty of contributory negligence, which called for a deduction in the damages awarded. In the Gill case, supra, this court approved of a rule by which to measure damages in cases of this character, and under it affirmed a judgment for $22,333.33. Gill was twenty-two years old, but his wife was thirty-four. Gill's gross earnings were $1800 or $150 per month. Net

earnings for the family, after taking out $700 for Gill's personal expenses, were $1100. Measured by the same rule the verdict in this case might have been much over $25,000, and been within the rule established in Gill's case.

In the Kidd case, supra, the deceased was the same age as deceased in the case before us now, but was only earning $184 per month. The judgment in Kidd's case was for $30,000, but this court compelled a *remittitur* of $5,000 and affirmed the judgment for $25,000. So, under these cases (and they are of our most recent holding), the judgment in the case at bar is more reasonable (under the facts) than either of the three judgments, supra. We can't cut this judgment.

From it all it results that the judgment *nisi* should be and is affirmed. All concur, except *Gantt, J.*, not sitting.