LOUISE O'DONNELL, Administratrix of Estate of THOMAS J. O'DONNELL, v. BALTIMORE & OHIO RAILROAD COMPANY, Appellant.— 26 S. W. (2d) 929.

Division One, April 2, 1930.

*Kramer, Kramer & Campbell* and *Fordyce, Holliday & White* for appellant.

1100

*Douglass & Inman* for respondent.

ELLISON, C.—This is an action under the Federal Employer's Liability Act (45 U. S. C. A. secs. 51-59) brought by Louise O'Donnell, administratrix of the estate of Thomas O'Donnell, deceased, for damages sustained by her, as widow, and by their minor daughter, Louise O'Donnell, as a result of said decedent's being run over and killed by a freight car in the defendant's yards at East St. Louis, Illinois, during a switching operation. The verdict was for plaintiff for $22,000, apportioned $17,500 to the widow and $4500 to the daughter. On motion for a new trial the court enforced a *remittitur* of $2500 to be taken wholly off the child's share. From the judgment on the verdict as thus reduced the defendant has appealed, assigning error in the giving and refusal of instructions, especially the refusal of demurrers to the evidence at the close of the plaintiff's case and the whole case. Complaint is made also of the size of the judgment.

The deceased was a car inspector. The casualty happened on July 19, 1925, about 6:30 P. M. in broad daylight. The *locus in quo* was a part of the appellant's yards where tracks 11 and 12 are located. These lie parallel east and west, about eight feet apart. Track 11 is south of track 12, and both curve to the south at their east end into a lead track which runs north and south and feeds these and other tracks.

A freight train known as No. 92, consisting of about thirty-five cars, an engine and tender, was standing on track 11, headed east and ready to leave for points outside the State of Illinois. The deceased and plaintiff's sole eyewitness, Watt, another inspector, had just completed a light inspection of the train and were standing at the head thereof near the engine tender. They were on the north side of the train between tracks 11 and 12. It was the deceased's duty to record the number of the engine and to note the time of departure; and also to observe whether the air brakes were functioning as the cars moved past him while the train was pulling out. The brake cylinders and plungers were attached high up to the bottoms of the cars about midway of their length. To see them it was necessary either to stoop or kneel, or else to step back about as far as the next track, seven or eight feet, whence they would be in view to an average man standing erect.

Another freight train known as No. 90 had been made up on track 12. A switch engine headed in from the east and pulled two cars therefrom back toward the lead track, stopping at a point which left clearance for No. 92 to get out. This put the west end of these two cars on track 12 about fifty or sixty feet east of the point where the deceased was standing near track 11. The switch engine was to pull them on out over the lead track after No. 92 had gone. Just after the switch engine and two cars passed, going

east, the witness Watt left the deceased and walked about seventy-five feet due north, crossing over track 12, to a drinking fountain near the corner of the yard office. No. 92 started to move out when he had travelled about half that distance. When Watt got to the drinking fountain he leaned over to take a drink. At that same time, Williams, a member of the switching crew attached to the switch engine, also came to the fountain. As he was leaning over and drinking he suddenly exclaimed "Oh, my God, I believe Tom got hit."

Watt and Williams rushed back and found the body of O'Donnell lying between the rails of track 12 with the legs and the lower part of the trunk south of the south rail. The two south wheels of the truck of a freight car had passed over his lower waist or hips. He died in a very short time. The way the casualty happened was that while he was standing close to track 12 the switch engine and two cars which had theretofore taken a position fifty or sixty feet eastward, again moved westward without a lookout and without any signal or warning, and struck him. Watt testified there was a custom in the appellant's yard requiring any standing engine to sound a warning bell before moving; and also to keep a field man or lookout at the forward end of moving cars. Once Watt said it was one or two minutes from the time he left O'Donnell until the latter was hit; another time he said No. 92 started to pull out a minute or two after he left O'Donnell and that about two-thirds of the thirty-five-car train had passed before the accident.

This witness was cross-examined vigorously on the proposition as to whether he did or could remember if the switch engine rang the bell before moving west and striking the deceased. He was sure the warning signal had not been given, and said also the engine bell on train ninety-two was not sounded and that there were no other switch engines working close at hand. He admitted he was not paying particular attention to the switch engine, but added he was where he could have heard the bell if it had been rung, and would naturally notice. Appellant argues if it was the custom and practice to sound the bell during switching operations the failure to ring it is the only thing that would have attracted the witness's particular attention, and since he says he was not paying particular attention that means the bell was rung.

It was also shown that when the witness gave a written statement to the railroad's representative after the accident he made this answer to one question: "I don't know whether or not the engine bell was sounded before the movement was made which resulted in his death. Had it been, I or any one else would not likely have heard it on account of the noise from No. 92 and the yard engine working there." Respondent's counsel further brought

out the point that the position selected by the deceased for inspection of the train after it pulled out was not a good one, because the train would have to go around a curve from the east end of track 11 to the lead track in such manner that he would not be in sight of the enginemen and could not give a stop signal if he found anything wrong. The witness further admitted the main or principal duty of field men or lookouts at the forward end of moving cars is to line up the switches.

The respondent also offered in evidence a rule book of the appellant railroad company issued in 1917, which the witness Watt said was used by yard switch crews (but not by inspectors) in 1925 at the time of the casualty. From this book rule 30 was read to the jury, as follows:

"The bell will be rung when an engine is about to move; while moving through tunnels; along the streets of towns and cities; approaching and passing public road crossings at grade, stations and trains on adjacent track."

Mrs. O'Donnell testified the deceased was fifty-one years old when he was killed, that she was forty-five and in good health, and their daughter sixteen. He had worked for the appellant between eight and nine years and his average wages were $160 per month, all of which was used for the support of the family. They also had an income of $40 to $45 per month from taking in roomers, but this was devoted to making $50 monthly payments on their home. According to the American Table of Mortality O'Donnell's life expectancy was 20.26 years.

All the members of the engine and switch crews which figured in the casualty testified for appellant. The foreman and two switchmen stated there was no custom in the yard to have a lookout posted at the front of moving cars, while making up a train. So, likewise, said D. C. Taliaferro, the yardmaster; R. E. Patterson, assistant general yardmaster, and H. R. Cole, engine foreman. The engineer and fireman both declared the switch engine had an automatic bell-ringer, and that when the movement was begun which resulted in O'Donnell's death, the bell was started; but the members of the switch crew were not questioned on this point. The fireman admitted, however, the custom of the yard did require the bell to be sounded before moving a standing engine.

The fact was also developed that the two cars had been taken off of train 90 to reduce the tonnage, and that after the switch engine had pulled them eastward toward the lead track and was standing there awaiting the departure of train 92, the yardmaster ordered a further reduction in the tonnage of No. 90 by taking off one more car. This accounted for the unanticipated movement back to the west. The testimony of one of appellant's witnesses was that the

switch engine and two cars stood at the east end of track 12 from three to five minutes, and another witness estimated as much as ten or fifteen minutes—much longer than respondent's witness Watt said had elapsed altogether from the time he left O'Donnell until the accident.

It was during this interval, Switchman Williams testified, that he went to the fountain to get a drink. He denied he was there with Watt when O'Donnell was struck, and affirmed, on the contrary, that he had returned to the side of the switch engine before the yardmaster gave the order to go back and get another car. Williams declared it was after the accident, when he had gone to the yard office for a stretcher, that he told Watt O'Donnell had been hit. Williams was corroborated by Hogan, the engineer, and Taliaferro, the yardmaster, as to his being by the switch engine when the movement was made.

From the rule book previously offered in evidence by respondent appellant read rule 103 as follows:

"When cars are pushed by an engine except when shoving or making up trains in yards a trainman shall take a conspicuous position on the front of the lead cars."

The appellant also introduced a written statement given by Watt to claim agent Bradford, dated August 13, 1925, about a month after the accident. This was the statement concerning which Watts had been cross-examined, as heretofore recited, in which he said he did not know whether the engine bell had been sounded just before O'Donnell was struck, because of the noise made by train 92 and the yard engine. But, without setting out the statement in full, we may say in other respects it rather tended to corroborate Watt's story on the stand, particularly on the points that O'Donnell was struck about two minutes after Watt had left him, and that Williams and Watt were both by the drinking fountain at the time, the former exclaiming he thought O'Donnell had been hit.

In rebuttal counsel for respondent requested appellant to produce a statement which Watt testified he had made to the railroad officials prior to the one mentioned above. Appellant replied there was no other statement except an oral interview. Thereupon the witness Watt produced a carbon copy of a statement he had given L. D. Thompson, general yardmaster, on July 19, 1925, the night of the accident. It was in the form of questions and answers which were taken down in shorthand and transcribed by Miss Nell Horn. Watt said several copies were made and that he signed all of them at the time. The copy printed in the record here, which apparently was Watt's copy, is shown as bearing his signature. It says nothing one way or the other about the ringing of the bell on the switch engine, but closely parallels his testimony on the witness stand other-

wise. He states the accident occurred about two minutes after he left O'Donnell and went to the drinking fountain; that Switchman Williams came up and got a drink, and just afterward said, "Tom got hit."

There were five assignments of negligence in the plaintiff's petition: (1) failure of appellant's employees to stop or slow up the switch engine and two cars, or to give adequate warning, after seeing or being duty-bound to see the deceased's dangerous position in time reasonably to have done so; (2) custom to have a lookout at the front of moving cars; (3) unusual and unanticipated movement of switch engine and two cars back to the west without warning to deceased, when he knew they were bound east over the lead track and supposed they would go that way; (4) rule and custom to sound warning before moving a standing engine; (5) movement of switch engine and cars westward on track 12 without warning, when operatives knew inspectors were likely to be dangerously near that track inspecting train 92 as it pulled out on track 11.

The only assignment of negligence submitted to the jury by the respondent's instructions was the fourth aforesaid, viz., negligent violation of a rule and custom to sound a warning before moving a standing engine. The appellant requested instructions withdrawing all five assignments, severally, but all were refused.

The appellant's answer was: (1) a general denial; (2) a plea of assumption of risk; (3) a plea of specific negligence that the deceased "came to his death as a direct and proximate result of his own careless and negligent act in going from a place of safety . . . into a place of danger . . . ."

I. The first contention made is that as a matter of law the deceased assumed the risk of injury under the facts in this record, and that appellant's peremptory instruction in the nature of a demurrer to the evidence should have been given for that reason.

The rule is well settled by controlling decisions of the United States courts that under the Federal statute a servant assumes extraordinary risks incident to his employment or risks caused by the master's negligence which are obvious or fully known and appreciated by him. [Boldt v. Penna. Rd. Co., 245 U. S. 441, 445, 38 Sup. Ct. 139, 140, 62 L. Ed. 385, 389.] If the hazard would be plainly apparent to a reasonably prudent person in like situation the servant cannot be supposed to be ignorant of it. [So. Pac. Co. v. Berkshire, 254 U. S. 415, 418, 41 Sup. Ct. 162, 163, 65 L. Ed. 335, 337.] And this applies to risks encountered by voluntarily choosing a dangerous place to work when a safe one is reasonably

available. [Atlantic Coast Line Rd. Co. v. Davis, 279 U. S. 34, 39, 49 Sup. Ct. 210, 211, 73 L. Ed. 601, 603; 39 C. J. sec. 833, p. 686, sec. 966, p. 766.]

Further, the general Federal rule is that a railroad company rests under no duty to employees working in its yards to sound bell or whistle on switch engines moving thereabout. [Aerkfetz v. Humphreys, 145 U. S. 418, 420, 12 Sup. Ct. 835, 836, 36 L. Ed. 758, 759.] An employee takes upon himself the hazard involved in going on or near tracks where he knows cars are likely to be shunted without warning. [Toledo, St. L. & W. Rd. Co. v. Allen, 276 U. S. 165, 171, 48 Sup. Ct. 215, 217, 72 L. Ed. 513, 516.]

But an exception to the doctrine of the Aerkfetz case is allowed in instances when the switching movement which produced the injury was covered by a rule or custom to give warning signals, established and observed for the protection of employees of the class involved, and the employee is shown to have been working in the line of duty at the time. The servant has the right in such instances to depend on the giving of the signal and does not assume the risk of injury if and insofar as it may grow out of a negligent failure to sound the warning, unless the hazard from *that* source was obvious or fully known and appreciated by him. [C. & O. Ry. Co. v. Mihas, 280 U. S. 102, 50 Sup. Ct. 42, 43, 74 L. Ed. 92, 94; Pacheco v. N. Y., N. H. & H. Railroad Co., 15 Fed. (2d) 467; Lehigh Valley Railroad Co. v. Doktor, 290 Fed. 763; Dir. Gen. Railroads v. Templin, 268 Fed. 483, 485, certiorari denied, 254 U. S. 656, 41 Sup. Ct. 218, 65 L. Ed. 460.]

This cause falls within that exception. The plaintiff's intestate was struck and killed by one of two cars attached to a switch engine which immediately theretofore had been standing about three car-lengths or 120 feet away, and which, according to the evidence for respondent, unexpectedly moved westward without ringing the bell contrary to a rule of eight years' standing and a custom prevailing in the yard.

No objection was made at the time to the respondent's proof of the custom, but appellant contends here it had no probative force or legal effect because the practice was not shown to have been uniform, general and long continued, citing such cases as Baker v. McMurry Contracting Co., 282 Mo. 685, 701, 223 S. W. 45, 50, and U. S. Shipping Board E. F. Corp. v. Levensaler, 290 Fed. 297, 301 et seq. These cases state the doctrine when the effort is to bring home knowledge of a custom in a trade or business to one not engaged in it, but they have no application to the facts here. A servant working for a master is engaged in the same business as the master, and as between them the custom need not be proven with such fullness as would make it a rule of the common law. [St. L. & S. F. Ry.

Co. v. Jeffries, 276 Fed. 73, 75; Koonse v. Mo. Pac. Rd. Co., 322 Mo. 813, 18 S. W. (2d) 467, 471, certiorari denied 280 U. S. 582, 50 Sup. Ct. 34, 74 L. Ed. 57; 17 C. J. sec. 19, p. 461.]

The appellant made no effort whatever to disprove the rule or custom, but met the issue only by presenting the testimony of its engineer·and fireman that the bell was rung on the occasion in question thereby impliedly affirming their existence. [Lehigh Valley Rd. Co. v. Doktor, supra, 290 Fed. l. c. 763.] It furthermore read to the jury another rule out of the same rule book. Evidence that a custom or practice existed and was followed conforming to a rule, certainly a rule promulgated eight years earlier, is evidence of its establishment. If it was established the deceased is presumed to have known of it. [Dir. Gen. Railroads v. Templin, supra, 268 Fed. l. c. 485.] ''The duty of the master as to giving notice is ordinarily performed when he has made the rules known to his servants, which rules if observed and followed by all concerned will bring such personal notice to everyone entitled to it.'' [39 C. J. sec. 590, p. 476.]

There is substantial evidence, direct or inferential, of the existence of the rule and custom, that the deceased knew of it, that he had a right to and did rely on it, and that he was engaged within the scope of his duties when he was struck and killed. Indeed, the appellant's evidence is confirmatory of the respondent's contentions on these issues. With this preliminary showing it cannot be said as a matter of law that the deceased assumed the risk of injury from a negligent violation of the custom unless it conclusively appears the danger of and from such breach was obvious or fully understood by him; and the burden was on the appellant to establish the fact. [Dir. Gen. Railroads v. Templin, supra, 268 Fed. l. c. 485; Oglesby v. St. L.-S. F. Ry. Co., 318 Mo. 79, 93, 1 S. W. (2d) 172, 178.]

Upon that point there was a total failure of proof. There was not the slightest evidence that the deceased had any reason to believe the appellant's enginemen might not ring the bell—no evidence that the rule requiring it ever had been violated or the custom disregarded. As is said in Reed v. Dir. Gen. of Railroads, 258 U. S. 92, 42 Sup. Ct. 191, 66 L. Ed. 480. ''In actions under the Federal act, the doctrine of assumption of risk certainly has no application when the negligence of a fellow-servant, which the injured party could not have foreseen or expected, is the sole, direct and immediate cause of the injury.'' And even though the negligent act of the employer or his servants be not the sole cause of injury, it is equally clear we think that if it is a contributing cause the employer cannot exempt himself from the consequences of the act on the theory of assumption of risk unless the injured party did or was bound to anticipate danger from that source.

The inquiry in this case is not whether the deceased knew he might not hear the bell though it were rung. [See Lehigh Valley Rd. Co. v. Mangan, 278 Fed. 85, 90.] The respondent staked her case on the proposition that her intestate's death was caused by a violation of the rule and custom, which presupposes he *would* have heard the warning and avoided injury had it been given. Whether he knew he might not hear it therefore becomes a moot question. Our conclusion is not only that the deceased did not assume the risk as a matter of law, but further, that there was no substantial evidence to take the question to the jury.

II. The next assignments complain of the giving of respondent's main instruction numbered 2, and a corollary instruction numbered 3. The former told the jury if it was the rule or custom and practice in the appellant's yard to give a signal before starting to move a standing engine and cars, and the switch engine and two cars in this instance were moved west on track 12 without giving a signal and struck and killed the plaintiff's intestate, and the failure to give the signal was negligence which wholly or in part contributed to cause his death, then the verdict should be for plaintiff. Instruction 3 said if the deceased was killed in the circumstances stated in Instruction 2, there was no issue of assumption of risk in the case.

The error charged is that Instruction 2 purporting to cover the whole case authorized a verdict without referring to and including appellant's defense of assumption of risk; and that Instruction 3 affirmatively excluded that defense as a matter of law. In this connection it should be further stated that Instruction 8, also given at respondent's request, declared the burden of proof was on the plaintiff "except upon the issue concerning the assumption of risk," thus recognizing there was such an issue in the case; and by Instruction 6, given at appellant's request, the court told the jury a servant "assumes the risk of injury to himself as the result of dangers and hazards which are open and obvious and which he can, or by the exercise of ordinary care could, appreciate and know were dangerous."

If the only complaint were of the omission of the affirmative defense of assumption of risk from Instruction 2, we would be compelled to say that error (if error) was cured by propounding the defense in the other instructions. [Meily v. St. L.-S. F. Rd. Co., 215 Mo. 567, 587, 114 S. W. 1013, 1019; Heigold v. United Rys. Co., 308 Mo. 142, 154, 271 S. W. 773, 776; Rawie v. C., B. & Q. Rd. Co., 310 Mo. 72, 96, 274 S. W. 1031, 1038.] But Instruction 3 affirmatively took the defense out of the case and undoubtedly is inconsistent

with other instructions which treat assumption of risk as an issue. We have, however, ruled as a matter of law there was no such issue. The error therefore was in the latter instructions in including the defense at all, and that was error of which the appellant cannot complain because it was in his favor. [Sec. 1513, R. S. 1919; 38 Cyc. p. 1607; State ex rel. State Highway Com. v. Duncan (Mo.), 19 S. W. (2d) 465, 467.] These assignments accordingly are overruled.

III. The next assignment is directed to respondent's instruction numbered 4. This instruction called attention to the fact that the appellant's answer pleaded the death of the decedent "was directly and proximately caused by his own carelessness and negligence in going from a place of safety between the two tracks into a place of danger on the track" in front of the switch engine and two cars, etc. It then continued by admonishing the jury the defense was valid only in case they found the alleged negligent act of the deceased was the sole cause of his death "and that defendant was not guilty of any act of negligence set out in these instructions that in whole or in part contributed" to cause his death.

It will be observed the answer does not allege the negligence specified *contributed* to the decedent's death, but charges it directly and proximately caused it. The obvious intent of the instruction was to give effect to the defense thus pleaded only as a specific plea of negligence wholly causing the casualty—such as might have been shown under a general denial—and excluding the defense of contributory negligence. The appellant says the plea was good and that the shearing away of that defense was prejudicial error since it might have operated in diminution of damages. After some hesitation we have concluded the instruction was proper because, as respondent contends, the attempted or asserted plea of contributory negligence in the answer was not good.

The Kansas City Court of Appeals has noticed the question four times. In two cases a similar plea was held bad because it did not charge contributory negligence, but amounted simply to a direct negation of the plaintiff's cause of action. [Ramp v. Met. St. Ry. Co., 133 Mo. App. 700, 704, 114 S. W. 59, 61; Cain v. Wintersteen, 144 Mo. App. 1, 4, 128 S. W. 274, 275.] In one case the pleading was condemned, but the court ruled since the issue had been treated by the parties as being in the case it would be so considered on appeal. [Miller v. Engle, 185 Mo. App. 558, 580, 172 S. W. 631, 639.] In another case a charge that the plaintiff's injuries "were caused solely and exclusively by his own negligence in" (specifying the acts) was held good as a plea of contributory negligence. [Cox v. Bondurant, 220 Mo. App. 948, 952, 7 S. W. (2d) 403, 405.] In Benjamin v.

Met. St. Ry. Co., 245 Mo. 598, 614, 151 S. W. 91, 96, a plea "if the plaintiff received any injuries . . . the same were caused by the plaintiff's own fault and negligence" was said to be insufficient, but rather on the ground that it was too general than that it did not set up *contributory* negligence. The weight of authority elsewhere holds the plea is not good. [45 C. J. sec. 697, p. 1119.]

Another fact to be considered is that the statute allows the defense of contributory negligence, not as a bar to recovery, but only in diminution of damages. [45 U. S. C. A., sec. 53.] Hence it is said in Sells v. A., T. & S. F. Ry. Co., 266 Mo. 155, 186, 181 S. W. 106, 114, the defense "must be alleged, not in bar, as under the State law, but in mitigation of the damages the plaintiff might otherwise be entitled to recover." So, in Porter v. L. & N. Rd. Co., 201 Ala. 469, 470, 78 So. 375, 376, a plea of contributory negligence in bar in an action under the Federal statute was held demurrable, and in So. Ry. v. Fisher, 199 Ala. 377, 380, 74 So. 580, 581, a similar plea was said to be defective. The plea in the instant case appears to be in bar. It wholly fails to disclose any intention to interpose the defense merely in reduction of damages, and next following it in the answer comes the prayer: "Wherefore, having fully answered, defendant prays to be hence dismissed with its costs."

It is true our courts have often said the prayer is no part of the petition and that the substantive averments of fact therein will not be destroyed by the prayer. [Monarch Vinegar Works v. C., B. & Q. Rd. Co., 285 Mo. 537, 543, 226 S. W. 546, 547; Baldridge v. Ryan (Mo. App.), 260 S. W. 536, 538.] But when the allegations of fact are ambiguous or susceptible of two constructions, the prayer may be looked to for the purpose of ascertaining the intention of the pleader. [31 Cyc. 83, 111; Cornet v. Cornet, 248 Mo. 184, 211, 154 S. W. 121, 129; Peak v. Peak (Mo.), 181 S. W. 394, 395; State ex rel. Brinkman v. McElhinney (Mo.), 216 S. W. 521, 524; Mayberry v. Clark, 317 Mo. 442, 448, 297 S. W. 39, 41.] And the rule is familiar that although the answer in a law action tenders equitable defenses it will not convert the proceeding into a suit in equity unless equitable relief is affirmatively prayed, thus making the prayer determinative of the whole nature of the cause of action, the other allegations permitting. [Jacobs v. Waldron, 317 Mo. 1133, 1137, 298 S. W. 773, 774.]

All things considered we conclude the plea here was not a good plea of contributory negligence: (1) because the ultimate fact alleged is that the death of the deceased was directly and proximately caused by his own negligence, not that that was a contributing cause; (2) because there is nothing to show the defense was offered in mitigation, though the Federal statute expressly allows it only for that purpose; (3) because the prayer of the answer indicates

the plea was intended to go to the whole cause of action and was in bar. We do not think the fact that the evidence showed the deceased went upon or near track 12 close to the two cars and switch engine, and that respondent, herself, introduced much of this evidence, amounted to a waiver of the bad plea. The evidence was introduced in proof of her case in chief and was considered by appellant to be responsive to its defense of assumption of risk. There is nothing to show the parties treated the defense of contributory negligence as being in the case.

Another objection made to the instruction is that as a condition precedent to returning a verdict for defendant it required the jury to find the defendant was not guilty of any act of negligence mentioned in the other instructions which contributed wholly or in part to cause the decedent's death. Appellant says this is an incorrect statement of the law because (quoting the brief substantially) if a primary duty rest on an employee to look after his own safety in a certain particular, and he violate that duty, he cannot recover though the injury might have been prevented by other employees sustaining a secondary relation to the movement. The cases cited are Frese, Admx., v. C. B. & Q. Rd. Co., 263 U. S. 1, 44 Sup. Ct. 1, 68 L. Ed. 131, affirming 290 Mo. 501, 235 S. W. 97; Davis v. Kennedy, Admx., 266 U. S. 147, 45 Sup. Ct. 33, 69 L. Ed. 212.

An examination of these cases will show they do not sustain the contention of appellant. Both dealt with collisions between trains at a point where two railroads intersected. In the Frese case a statute, and in the Davis case a rule, made it the absolute and non-delegable duty of the engineer who was killed in the collision to see that the way was clear and that no train was coming on the intersecting line before crossing it. He was physically in control of the train and was forbidden to depend on any one else. It was held his representative could not recover for his death because it was proximately and wholly due to his own negligence. In the instant case the deceased had a right to rely on the giving of the warning signal by those operating the switch engine. The decisions are clearly distinguishable.

IV. The next assignment is that respondent's instruction numbered 7 on the measure of damages authorized the jury to assess the whole amount of compensatory damages warranted by the evidence (in case they found for plaintiff on the question of liability) without providing for any deduction if they believed the deceased guilty of contributory negligence. Complaint is made also because the court refused appellant's

Instruction F which required a paring down of the damages in proportion as any negligence of the deceased may have contributed to cause his death. The ruling on these instructions was not error, since contributory negligence was not sufficiently pleaded in the answer to bring it into the case, and did not appear conclusively from the plaintiff's own showing. [Kleinlein v. Foskin (Mo.), 13 S. W. (2d) 648, 655.]

V. The appellant offered four instructions severally withdrawing from the consideration of the jury the four assignments of negligence tendered by the petition which were abandoned in the submission of the case. The court refused to give them, and this is assigned as error. It has been repeatedly held this does not call for a reversal of the case. [Poppen v. Wagner Elec. Corp. (Mo. App.), 2 S. W. (2d) 199, 202; Dietzman v. St. Louis Screw Co., 300 Mo. 196, 215, 254 S. W. 59, 65.]

VI. Last, it is urged the verdict is excessive. No cases are cited, but the facts are pointed out that the deceased was fifty-one years old and was receiving $160 per month; that he could not hope to follow his occupation for the whole term of his expectancy, twenty and twenty-six-hundredths years; and that six per cent annual interest on the judgment of $19,500 would amount to $1170, more than half the deceased's earning capacity of $1920 per year, conceding the beneficiaries would have received the whole thereof and that the wife would have been supported for the entire period, she being younger and her expectancy therefore greater than his.

Considering the latest cases on the subject we are unable to hold the judgment excessive. In Gude v. Weick Bros. Undertaking Co., 322 Mo. 778, 16 S. W. (2d) 59, 62, the deceased was fifty-three years old and his wife fifty-four. His earnings were $24.30 per week, or about $100 per month, of which his wife used half. It was held a verdict for $10,000 was so clearly reasonable as to make an examination of the precedents unnecessary. In Potterfield v. Term. Rd. Assn., 319 Mo. 619, 5 S. W. (2d) 447, 452, the deceased switchman was forty years old and earned $180 per month. About $150 went to the support of his family. A verdict of $22,750 was upheld. In Oglesby v. St. L.-S. F. Ry. Co., 318 Mo. 79, 98, 1 S. W. (2d) 172, 180, the deceased and widow were both about thirty-five years old and there was a son sixteen. The father earned $200 per month which "he brought home to his family." A verdict of $25,000 was held to be well within the more recent cases under the Federal statute. In Kidd v. C., R. I. & P. Ry. Co., 310 Mo. 1, 46, 274 S. W. 1079, 1094, the deceased was a locomotive engineer thirty-five years

old, earning $184 per month "which he turned over to his wife." The verdict of $30,000 was reduced to $25,000.

The sixteen-year-old daughter in this case was awarded $2000 and the wife $17,500. It is not clear from the evidence just how much of the father's earnings went to the support of each, though he undoubtedly used part of it himself. On a six per cent basis under the Carlisle tables the present value of an annuity of $1920, the amount of his annual earnings, for the period of his expectancy, would be just about $20,000 (See Sec. 7547, R. S. 1919) ; if he contributed only, say, $1500 per year to his family, it would be $15,633. On a five per cent basis under the Actuaries or Combined Experience Table used by the State Insurance Department and in computing state inheritance taxes (Laws 1921, p. 115) it would be $21,283 in the one case, and $16,627.50 in the other. The figures would be still higher on a four per cent basis (See Gill v. B. & O. Rd. Co., 302 Mo. 317, 333, 259 S. W. 93, 97). There is no way of reducing the matter. to a mathematical certainty; too many variable factors enter into it. The issues of fact and the inferences to be drawn from the evidence bearing on the amount of damages are primarily and peculiarly for the *nisi prius* court. On the record presented we do not feel justified in substituting our judgment for that of the trial jury and judge.

The judgment is affirmed. *Lindsay* and *Seddon, CC.*, concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.