JOHANNA FRESE, Administratrix of Estate of
    JOSEPH J. FRESE, v. CHICAGO, BURLINGTON
    & QUINCY RAILROAD, Appellant.

In Banc, November 30, 1921.

1. **COLLISION OF TRAINS: Crossing Track at Surface: Clear Way:
   Failure to Ascertain.** Where the statute of Illinois required all
   trains, when approaching a crossing with another railroad upon the
   same level, to be brought to a full stop within eight hundred feet
   of the crossing, and the engineer to ''positively ascertain that the
   way is clear and that the train can safely resume its course before
   proceeding to pass the crossing,'' the wife of the engineer, who
   was killed, cannot, under the Federal Employers' Liability Act,
   recover damages from the company whose Illinois train he was
   operating at the time of its collision with a train on the crossing
   railroad, where her own evidence shows that he did not ''positively
   ascertain'' that the way was clear before entering upon the cross-
   ing.

2. ———: ———: ———: **Customary Observance of Statute.** The
   positive requirement of a statute that the engineer of a train
   about to cross another railroad must bring the train to a full stop
   and ''positively ascertain that the way is clear and that the
   train can safely resume its course before proceeding to pass the
   crossing'' cannot be abrogated by a showing that there was a
   custom or usage in force upon the engine whereby it became the
   duty of the fireman to look out for approaching engines on his
   side of the train and to notify the engineer in case he saw an
   engine approaching the crossing on the other railroad. Besides,
   if such requirement could thus be abrogated, the custom or usage
   would not be binding upon the company unless there is evidence
   tending to show that the company or its officers had notice of it,
   and even then it must be pleaded.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B.
                    Allen,* Judge.

REVERSED.

*H. J. Nelson, E. M. Spencer* and *M. G. Roberts* for appellant.

(1)	The instruction in the nature of a demurrer to the evidence should have been given. No substantial evidence was introduced tending to establish that the negligence of the fireman caused the collision. Plaintiff's evidence does establish that the fireman was at his post of duty, keeping a lookout through the front window of the cab, but nowhere in the record is there a semblance of testimony that he failed to exercise ordinary care. This court has never ruled that from proof of a collision the jury may infer or presume that it was due to negligence and not to an accident, and, further, that it was caused by the negligence of a particular one of the two train crews. Whitesides v. Chicago B. & Q. R. Co., 186 Mo. 619; Hamilton v. K. C. So. Ry. Co., 250 Mo. 722; Removich v. Bambrick Const. Co., 264 Mo. 54; Coin v. Talge Lounge Co., 222 Mo. 508; Patton v. Texas & P. R. Co., 179 U. S. 658, 45 L. Ed. 361; Warner v. Railroad, 178 Mo. 125; Looney v. Met. Ry. Co., 200 U. S. 488; New Orleans & N. E. Railroad v. Harris, 247 U. S. 367; Seaboard A. L. R. Co. v. Horton, 233 U. S. 502, 58 L. Ed. 1062. (b) The sole circumstance relied upon to show that Savage did not keep a lookout is McGee's testimony to the effect that he was looking ahead through the front window of the cab and not, as plaintiff contends he should have done, through the side window. It is argued, therefore, that he did not see the Wabash train. There is no evidence in the record that a person looking ahead through the front window of the cab could not see down the transfer track west of the depot. To properly perform his duty, he had to look along the Q track as well as to the side in front of him. Looking, therefore, through the front window was the proper course, especially as the train was moving to the southeast. In that way the line of vision was narrow enough to enable him to see on both sides of the depot for an approaching train. The fireman is at all times sub-

ject to the orders and commands of the engineer. In the absence of evidence that he disobeyed the instructions of his superior, the law will place the blame for the accident on him whose duty it was to "positively ascertain." The facts of record show conclusively that he failed so to do. Great Northern Ry. v. Wiles, 240 U. S. 444, 448. (2) Defendant's refused Instruction F which declared that the duty of the engineer under the statute was a personal one which the law cast upon him and which he could not delegate or place upon another, should have been given. Just how the court could refuse to give this instruction and at the same time admit the Illinois statute in evidence, is difficult to see. The Illinois law clearly placed upon the engineer the responsibility of positively ascertaining that the way was clear and the crossing safe before proceeding thereon with his train. That such an obligation, so imposed is a personal one, there can be no question. If it be personal, then a man so situated cannot delegate that duty to anyone else, or rely upon anyone else for its performance. He must himself personally do what the law personally commands him to do. (3) Defendant's refused Instruction E should have been given because if the accident was due to Frese's own negligence, his personal representative cannot recover. If it was due to the negligence of the engineer of the Wabash, Frese's personal representative could not recover as against the Burlington. Likewise, if it was due to the negligence of both Frese and the engineer of the Wabash, there could be no recovery against this defendant. (4) Defendant's refused Instruction C should have been given. There was a statutory obligation upon Frese to positively ascertain that the crossing was safe before he attempted to pass over it. If therefore, his failure to observe the statute caused the collision, defendant was entitled to a verdict. (5) The testimony of the Alton engineer as to the usual manner and custom of ascertaining whether a crossing is clear and as to the nature of the duties of an engineer, should not have been admitted

in evidence. The statute of Illinois plainly designates the nature and character of the duty of an engineer when approaching a grade crossing. The statute cannot be changed by a custom. Proof of the usual manner does not excuse negligence arising from a violation of the statute. Evidence of a custom was not admissible. Clark v. St. Joseph T. Ry. Co., 242 Mo. 570.

*Mytton & Parkinson* for respondent.

(1) Railroad tracks in and of themselves suggest danger, and everyone having reached the age of reasonable discretion is presumed to know this fact, and the law therefore enjoins the duty upon one approaching a railroad track and crossing to exercise ordinary care by looking and listening for approaching trains, and the action of the fireman Savage in approaching the Wabash track and crossing with his head outside of the side cab window and looking through the front window in the direction in which he was going, and not to the side, was, if not negligence as a matter of law, gross negligence as a matter of fact. Dyrez v. Mo. Pac. Ry. Co., 238 Mo. 33, 46; Holland v. Mo. Pac. Ry. Co., 210 Mo. 338; Connor v. Wabash R. R. Co., 149 Mo. App. 675, 686; McNeil v. Mo. Pac. Ry. Co., 182 S. W. 762. (2) The failure of a party to call witnesses in its employ and under its control, who know vital facts affecting the issue upon which the case is tried, is a strong circumstance against such party. McCord v. Schaaf, 216 S. W. 320; Willitts v. Railroad Co., 221 S. W. 65; Schooler v. Schooler, 258 Mo. 83, 95; Phillips v. Tel. Co., 194 Mo. App. 470; Van Ness v. Ry. Co., 181 Mo. App. 379; McClanahan v. Railroad, 147 Mo. App. 412. (3) In an action for negligent death, decedent is presumed to have used reasonable care for his own safety in the absence of evidence to the contrary. Grant v. Kansas City So. Ry. Co., 190 S. W. 586; Bueshing v. St. Louis Gas Light Co., 73 Mo. 219; Capp v. St. Louis, 251 Mo. 345, 373; Tibbels v. Ry. Co., 219 S. W. 109; Wack v. Railroad, 175 Mo. App. 122. Except for the admissions in the plead-

ings and during the trial there is not one scintilla of evidence concerning the conduct of the decedent Frese as locomotive engineer except that he brought his train to a stop and whistled in compliance with the law within 800 feet of the crossing, and at·a point 249 feet from the grade crossing. It is not pointed out anywhere in appellant's brief in what particular the engineer failed to comply with the statutory law of Illinois, or in what particular he was negligent. The evidence unquestionably showed he could not see trains approaching from the fireman's side on the Wabash track, and that he was running six or seven miles an hour. What he failed to do that he should have done, or what he did that he should not have done, is nowhere pointed out. It is not pretended that he could have left the throttle of his engine. It cannot be pretended that he would have heard the Wabash train approaching with the noises of his own train about him. He did nothing that he should not have done and he did not fail to do anything that he could or should have done to see that the way was clear and that it was safe for him to make the crossing. (4) Defendant's refused Instructions C, D, E, F and G were properly refused. (a) Instruction C does not follow in its terms the duties imposed by the Illinois statute pleaded, but enlarges the duty of an engineer in approaching a grade crossing. The instruction eliminated the engineer's duty to stop and positively ascertain the crossing was clear before proceeding and misstated the duty devolved upon him by the statute by requiring him absolutely to know that the crossing was clear and he could proceed over the same in safety, although the statute made no such requirements, but simply required him to bring his train to a stop and to positively ascertain that the way was clear, and that the train could safely resume its course before proceeding to pass the crossing. Further, the instruction disregards the provisions of the Federal Employers' Liability Act which permits the plaintiff a recovery even though he were negligent in violating the

statute if the negligence of the fireman contributed to and caused his death.  The instruction authorizes a verdict for defendant upon mere proof of negligence of the deceased without any regard to the fact of whether or not his negligence was the sole negligence.  Further, there is absolutely no evidence upon which to base an instruction that the engineer Frese in any way violated the statutory provision or was guilty of any negligence whatsoever.  (b)  Instruction D is objectionable for the same reasons urged against Instruction C.  (c)  Instruction E is faulty for the reasons urged against C and D.  (d) Instruction F contains all of the objections urged to the preceding instructions and is objectionable for the further reason that there was no evidence upon which to base it.  There is no evidence in the record of any attempt by the decedent Frese to delegate the duty devolved upon him by the law.  (e)  Instruction G indulges a presumption in favor of the defendant, which it is not even pretended here should be allowed.  When evidence of facts appear, presumptions disappear.  The evidence clearly showed exactly what Savage did and what his conduct was in approaching this crossing.  No presumption of law attended his acts and determined them to be the acts of a person in the exercise of ordinary care.  The facts were before the jury for them to determine whether his conduct was negligent or otherwise.

WOODSON, J.—This suit was instituted in the Circuit Court of Buchanan County, by the plaintiff against the defendant, to recover damages for the alleged negligence of the latter in killing the former's husband.  The trial resulted in verdict and judgment for the plaintiff in the sum of $12,000 and in proper time and manner the defendant appealed the cause to this court.

Counsel for both plaintiff and defendant have made a full and fair statement of the case in their respective briefs, but we will adopt that of plaintiff as it probably more clearly emphasizes the points presented for consideration, which is as follows:

Frese v. Burlington Railroad.

This is an action by Johanna Frese, Administratrix of the Estate of Joseph J. Frese, deceased, to recover compensation under the Federal Employers' Liability Act for the benefit of herself, as his widow, and their children, on account of his death on the 30th day of October, 1916, from injuries inflicted on that date at Hulls, Illinois, while he was a locomotive engineer in the employ of the defendant company and operating one of its trains, by reason and on account of the negligence of the defendant company, through its fireman, Savage, on account of said train being run into collision with a train operated by the Wabash Railroad Company.

At the time of his death Joseph J. Frese had his mansion house and principal place of abode in Adams County, Illinois, and Mrs. Frese was appointed administratrix in the court of that county having probate jurisdiction, and instituted this suit in the Circuit Court of Buchanan County, Missouri.

The tracks of the Chicago, Burlington & Quincy Railroad Company at Hulls run from northwest to southeast in a straight line, and cross at grade the tracks of the Wabash Railroad Company, which run directly east and west.

North of the Wabash tracks and east of the Burlington tracks a joint depot is located, the southwest corner of which is seventeen feet and two inches from the east rail of the Chicago, Burlington & Quincy Railroad Company track. The depot is twenty-two feet and four inches in width, and fifty-two feet and six inches in length, and is in a position at an angle to both tracks and not parallel with either.

The plaintiff's Exhibits "L" and "J," being plats produced by the plaintiff and defendant, respectively, each very accurately show the physical situation (but which are too extensive to be set out here).

A transfer track running from the Chicago, Burlington & Quincy Railroad Company track to the Wabash track north of the depot leaves the Burlington track at a switch point three hundred and fifty-five feet northwest

of the crossing, and with the frog formed by the transfer track and the Burlington track a distance of two hundred and eighty-three feet northwest of the crossing, running into the Wabash track at a switch point distant from the railroad crossing along the Wabash Railroad three hundred and fifty-five feet and six inches, with the frog point formed by the transfer track and the Wabash track at a point two hundred and eighty-one feet and six inches east of the crossing along the Wabash railway. The length of this transfer track from frog point to frog point is five hundred and forty-two feet and six inches, and it bends so that it parallels the northeast side of the depot at a distance of fifteen feet therefrom.

North of this transfer track and in the bend are a number of buildings. Northwest of the depot and between the Burlington track and the transfer track is a coal shed indicated on the map, ten feet high, seven feet and four inches wide and fourteen feet long, located fifteen feet from the Burlington track and six feet from the transfer track. The buildings north of the transfer track and the depot and coal shed, mentioned in evidence, obstruct a view from the engine of a train approaching the crossing along the Chicago, Burlington & Quincy Railroad from the northwest of any train which may be coming from the east along the Wabash track approaching the crossing, so that a view may be had only intermittently.

At a point two hundred and forty feet from the crossing northwest along the Burlington tracks a view may be had looking north and east of the depot of a person standing east from the crossing upon the Wabash track one hundred and fifteen feet therefrom, and not at any place closer to the crossing; and from that point east to a point upon the Wabash track two hundred and thirty-seven feet from the crossing and not at a point beyond that to the east.

From a point two hundred and seventy-six feet northwest along the Burlington track from the crossing a view may be had looking north and east of the depot of

a man standing upon the Wabash track east from the crossing one hundred and nine feet and not closer, and east from the crossing one hundred and ninety-seven feet and not beyond that point to the east. As you approach the crossing from the northwest along the Burlington track closer that two hundred and forty feet the view of the Wabash track becomes intermittently obstructed by the coal shed and the depot until a train approaching from the east on the Wabash track could only be seen south of the depot and practically on the crossing.

The evidence of the witness Leslie on cross-examination shows that at a point one hundred and ninety-seven feet from the crossing northwest along the track of the Chicago, Burlington & Quincy Railroad you could see a train on the Wabash track if there had been one there, but he says nothing to show at what point upon the Wabash track the train had to be to be seen. His evidence also showed that if the pilot of the engine was at a point one hundred and ninety-seven feet from the crossing the fireman in the cab would be sixteen to eighteen feet farther to the north and that from that point you could see a train on the Wabash track looking north of the station, but his evidence does not in any way indicate where the train would be on the Wabash track.

On the 30th day of October, 1916, Joseph J. Frese, as locomotive engineer, and Savage, as fireman, in the employ of the Burlington Railroad, were running a mixed train, consisting of six or eight freight cars and two passenger coaches, in interstate commerce from the northwest, traveling southeast approaching the depot and crossing at Hulls, about 5:30 in the evening. The pilot of the engine was brought to a stop twelve or fifteen feet northwest of the stop post, as it then existed, located at the northeast corner of the section house, a distance of one hundred and ninety-seven feet northwest from the crossing.

Giving heed to the evidence of McGee as to where the stop post was then located and also as to where the

engine stopped with reference to the road, and the evidence of Leslie as to the length back from the pilot the fireman is when sitting in the engine, this would place the fireman about two hundred and thirty or two hundred and forty feet northwest of the crossing.

The whistle upon the Burlington engine was sounded twice. No sounding of a whistle of the engine on the Wabash track was heard by the witness standing by the Burlington engine.

The evidence of the Wabash engineer, Long, was that at a point about three hundred feet east of the crossing he stopped his engine and freight train and whistled twice. The probable deduction from the evidence of the two witnesses, and the fact, was that the two engines whistled simultaneously. The Burlington engine then proceeded southeast along the track at a rate of speed of six or seven miles an hour, intending to stop with the train at the depot, which would throw the engine some little distance across the Wabash track to the southeast. The Wabash train proceeded west toward the crossing at a rate of speed estimated by the engineer of eight miles an hour. The pilots of the engines met at the crossing, derailing and turning over the Burlington engine and killing Frese, the locomotive engineer upon the Burlington train. The collision occurred at about 5:30 in the evening at a time when it was light, not dark. (Witness McGee).

Further, the Wabash engineer, Long, testifying as to the conditions existing at the time of the collision, said:

"Q. What was the condition of the weather? Was it clear or cloudy? A. I don't know whether it was clear or cloudy; it was just hazy-like; if you have ever been out on the road in the fall of the year you will run along maybe a half mile and you are in a haze, and maybe the next half mile it is just as clear as crystal; that is the way it was.

"Q. Was it clear or hazy at Hulls at that time? A. It was kind of hazy.

"Q. Was it raining? A. No, it started raining right after the wreck.

"Q. I will ask you whether it was cloudy at the time of the collision? A. Must have been; it was kind of dark."

It will thus be seen that it was light enough for a person to see distinctly if intent upon what he was doing, and dark enough that a person could not see objects at any distance by a mere glance. The evidence was silent upon whether or not the locomotive engineer Frese, when the train stopped, went over to the fireman's side to look for the approach of a train upon the Wabash tracks from the east, but that is immaterial for the reason that if he had done so he could not have seen the Wabash train, because it was a greater distance east along the Wabash track from the crossing than he was north and west along the Burlington track from the crossing. This is deduced from the evidence of the witness McGee, who says the Burlington train was running six or seven miles per hour, and is further established by the photographs.

Of course, Frese, having sounded the whistle and started the train toward the crossing, could not at the same time have his train under control and leave his position at the throttle to look for the approach of trains on the Wabash track from the east or fireman's side of the engine.

The evidence of the witness Wade shows positively that the engineer, when at his proper post, had no view whatever of anything on the fireman's side.

The evidence of the witness McGee as to the action of the fireman, Savage, established convincingly his negligence. McGee states that from the point where the engine stopped to a point a distance of fifty or sixty feet from the crossing he observed the fireman, and that the fireman sat with his head outside the cab window looking through the front window of the cab to the southeast during all of that time. It will be remembered that the direction of the Burlington train approaching the cross-

ing is directly southeast. From the demonstration and evidence given by McGee it is clear that Savage, in his position and looking as he was, could not have seen even in a crystal clearness of the atmosphere the Wabash train approaching from the east.

Witness McGee testifying:

"Q. Did you notice the fireman on the Burlington engine when he passed you? A. Yes, sir.

"Q. What was he doing? A. It seemed like he was looking straight ahead.

"Q. What was the position of his head with reference to sitting or leaning? A. Well, he was leaning in the cab something like this (indicating.)

"Q. What was he looking through as he looked forward? A. It looked to me like he was looking through the front window.

"Q. Was he looking outside of the cab, or looking through the front window in front of the cab? A. It looked to me like he was looking through the front window.

"Q. Did you continue to watch him as he approached the crossing? A. Yes, sir.

"Q. How close had his engine gotten to the Wabash crossing track when he continued in that position? A. I judge thirty to thirty-five feet.

"Q. From what? A. The depot.

"Q. From what part of the depot? A. The southwest corner.

"Q. That would be this corner (indicating)? A. Yes, sir.

"Q. How far was he from the crossing itself, in feet? A. Oh, I judge about fifty or sixty feet, something like that.

"Q. Did you see what he then did? A. No, sir."

From a distance much greater than sixty feet along the Burlington track northwest of the crossing it would be impossible to see a train approaching the crossing from the east on the Wabash track except as it emerged

into view south of the depot; and from a view obtained in this manner the trains would, of course, be too close to avoid a collision.

The fireman Savage, still in the employ of the defendant Chicago, Burlington & Quincy Railroad Company, was present at the trial, but was not placed upon the stand by defendant.

"Mr. Parkinson: We offer in evidence deposition of Mr. Savage, taken under notice given by the plaintiff.

"Mr. Roberts: We object because the witness is here.

"The Court: Objection sustained."

The evidence established that it was immaterial whether headlights were lighted upon the engines or not, for the reason that in the daytime or light they would not cast any rays forward.

Robert B. Caldwell testifying:

"Q. Mr. Caldwell, I neglected to ask you one question when you were on the stand. You answered a question as to whether or not an electric headlight would show. Did you mean in the light or dark? A. In the dark.

"Q. State whether or not in daylight either an electric headlight or an acetylene headlight will project a light one hundred feet. A. Not in daylight.

"Q. State do you know what it will do at 5:30 in the month of October on the Missouri River bottom? A. I think at that time it would show some reflection.

"Q. State whether or not you could tell how far it would be, a foot or ten feet or fifteen feet. A. No, sir, I couldn't tell."

The evidence showed that the customary way by which an engineer positively ascertained that a grade crossing, not controlled by semaphore, was safe, was by bringing his train to a stop, ascertaining from the fireman the conditions upon his side, observing ahead upon his own side and keeping his engine under control by remaining at his post of duty.

290 Mo.—33

The evidence also showed that it was customary in approaching a railroad crossing for the fireman to protect the engine and train from his side by observation and warning to the engineer, if necessary.

A jury, the second one which had passed favorably on the case, found for the plaintiff in the sum of twelve thousand dollars.

The plaintiff's evidence showed that the engineer was in charge of the engine, and the defendant offered in evidence a statute of Illinois, which reads as follows:'

"All trains running on any railroad in this State, when approaching a crossing with another railroad upon the same level, or when approaching a swing or draw bridge, in use as such, shall be brought to a full stop before reaching the same, and within eight hundred feet therefrom, and the *engineer or other person in charge* of the engine attached to the train *shall positively ascertain that the way is clear* and that the train can safely resume its course *before proceeding to pass* the bridge or *crossing*."

At the close of the plaintiff's case counsel for the defendant asked an instruction in the nature of a demurrer to the evidence, which was by the court refused and counsel for defendant duly excepted.

I.  There are many errors assigned by counsel for the appellant, but from the view we take of the case it will not be necessary to notice but one of them, and that is the refusal of the trial court to give appellant's demurrer to respondent's evidence.

Demurrer to Evidence.

This action of the court in our opinion was reversible error, for the reason that respondent's own evidence showed that the engine in question was under the control of the engineer who was killed, and under the statute of Illinois, before copied, imposed upon him the imperative duty to *positively ascertain that the way was clear* before entering upon the crossing.  This he did not do; but had he done so, he clearly would not have been killed.

II.   Counsel for respondent attempt to escape the operation of the statute before mentioned by introducing evidence tending to show that there was a custom or usage in force upon the engine in question whereby it became the duty of the fireman thereof to look out for approaching engines on his side of the train and to notify the engineer in case he saw an engine approaching the crossing over which they were to cross.

Abrogation of Statute: Custom.

The trouble with this position is, no such question was presented by the pleading, and independent of that the evidence introduced does not tend to show that the officers in charge of the appellant company had any notice of the existence of said custom.   Moreover in my opinion the existence of such a custom, if it existed, could not have the effect to abrogate the statute mentioned.

In a somewhat similar case, the Supreme Court of the United States in discussing this question used this language:

"His fate gives pause to blame, but we cannot help pointing out that the tragedy of the collision *might have been appalling*.   He brought *death to himself* and to the conductor of his train.   His neglect might have extended the catastrophe to the destruction of passengers in the colliding train.   How imperative his duty was is manifest.   To excuse its neglect in any way would cast immeasurable liability upon the railroads and, what is of greater concern, remove security from the lives of those who travel upon them; and therefore all who are concerned with their operation, however high or low in function, should have a full and an anxious sense of responsibility."   [Great Northern Ry. v. Wiles, 240 U. S. 444, l. c. 448.]

For the reasons stated the judgment of the circuit court is reversed and judgment will hereby be rendered for the appellant.   *Graves, Higbee* and *David E. Blair, JJ.,* concur; *Elder, J.,* concurs in the result; *James T. Blair, C. J.,* and *Walker, J.,* concur in reversing the judgment, but think the cause should be remanded.