JOSEPH G. PERRY v. MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, Appellant.—104 S. W. (2d) 332.

Division One, April 21, 1937.

Carl S. Hoffman and Everett Paul Griffin for appellant.

1054

*Wm. H. Allen* for respondent.

BRADLEY, C.—Action under Federal Employers' Liability Act (45 U. S. C. A., sec. 51 et seq.) for personal injury. Plaintiff obtained verdict and judgment for $10,000 and defendant appealed.

After preliminary allegations, plaintiff alleged that on September 1, 1933, while in the scope of his employment inspecting and adjusting couplers between freight cars standing on bridge track 1 (in defendant's Baden yards in north St. Louis) a cut of cars in charge of defendant's agents and employees was kicked and moved by an engine against the cars between which he was working, causing plaintiff to be caught between the couplers; that his injury resulted in whole or in part from the negligence of the defendant in the following particulars. ''Plaintiff received notice from the agents and employees of defendant in charge of the switching of cars in said yard that two of the cars on track bridge 1 were separated and not coupled together and plaintiff was notified and requested by defendant's agents to go down and inspect the couplers and ascertain the condition of same. Defendant's agents aforesaid then and there made a promise and agreement not to move or kick any cars on track bridge 1 until plaintiff had finished his work about the couplers of the two cars that were separated in said track. Plaintiff, relying upon the promise and understanding not to move any cars into track bridge 1, proceeded to the point where the two cars were separated and while he was engaged in inspecting and adjusting the couplers, without notice or warning to him and in violation of said promise and agreement on the part of the defendant's agents and the agents and employees in charge of the engine and cut of cars, negligently moved and kicked a car or cars against

the cars between which plaintiff was working on said track, catching and crushing plaintiff's left hand and forearm between the couplers, injuring him. . . ."

After general denial defendant answered as follows: "Further answering, defendant states that plaintiff's injuries, if any, were due to plaintiff's negligence, which directly contributed thereto in this, to-wit: That the plaintiff knew, or by the exercise of ordinary care on his part could have known, that the switching crew was engaged in making up a train on said track and that cars were likely to be moved in on said track at any time and that without any care for his own safety plaintiff negligently and carelessly placed himself in a position of danger.

Further answering, defendant states that it was a rule of defendant and a custom in said railroad yards that, before employees should do any work at or about any car or train standing in said yards, blue flags by day and blue lights by night should be displayed by said employee, and that said rule and custom were known to plaintiff; that plaintiff negligently and carelessly failed to comply with said rule and custom; that the danger of cars being moved in on said track was known to plaintiff or was so open and obvious that a reasonably prudent person would have observed and appreciated the danger and that plaintiff assumed all risks and hazards arising from or growing out of the circumstances complained of." The reply was a general denial.

Error is assigned (1) on the refusal of defendant's peremptory instruction for a directed verdict at the close of the whole case; (2) on instructions given and refused; and (3) on the admission of evidence. No claim is made that the cause is not properly under the Federal Employers' Liability Act. Two amputations between the wrist and the elbow were performed on plaintiff's arm, and no point is made on the amount of the verdict. We rule the assignments in the order stated.

Plaintiff was a car inspector and had been in the employ of defendant "slightly over ten years." In the Baden yards were several tracks extending north and south, and plaintiff, when injured (September 1, 1933, between 8:10 and 8:20 P. M.), was on bridge track 1. This track was the fourth from the west side of the yards. Freight train No. 71 was being made up. There were two inspectors and three switchmen in addition to the engineer and fireman. The cars in the yards to be placed in train No. 71 were being collected by the switching crew and placed on bridge track 1. Elmer Morgenthaler was a member of the switching crew, but not the foreman. Plaintiff testified that the cars that were to be in train No. 71 had been inspected by him and inspector, Lloyd, while these cars were in the yards and before being placed on bridge track 1, but that the defect in the coupler he was endeavoring to correct

when injured, was one that would not be discovered by the inspection made while the cars were in the yard and prior to assembly on bridge track 1.

Plaintiff's evidence as to why he went between the cars and how he was injured is: Having finished with the yard inspection, he started down bridge track 1. He testified that when he got to the telephone box he passed Morgenthaler; that Morgenthaler told him "there was a coupler there that hasn't made and you had better look at it, because we are late on this train now;" that he, plaintiff, talked with Morgenthaler "a little bit" and went "up to where the coupler was;" that he asked Morgenthaler if "he would watch for me until I looked and seen how this coupler was or what was the matter with it;" that Morgenthaler stepped over the track far enough to get a clear vision; that from where he, plaintiff, was standing he couldn't see because of the cars ahead. "By his (Morgenthaler's) having stepped back, naturally I assumed he was watching for me there and I asked him then, "How does that look up there? He said, 'Well, the engine is going in the bridge yard;' so I went ahead and opened these knuckles and examined there. I seen what was the matter with them. The type D coupler is liable to come into a fall, but if you take hold of the block and reach up, then it will do very well then. It isn't a serious defect—that is, it won't affect the train after it is coupled—so I just dropped this knuckle on the south end of the north car and reached to open the knuckle on the north side and lifted the pin with my right hand, and just as I did the cars came together and caught my hand. I looked around and I thought Elmer (Morgenthaler) was standing there, presumed he was, and he was gone."

It was after dark when plaintiff was injured, and if the blue light rule should have been observed, when he went between the cars, it was his duty to put up the blue light and it would remain up until he took it down. A blue flag was used in daytime and a blue light at night.

Plaintiff testified that it was the duty of the inspectors to inspect the cars while in the yard and before assembly on bridge track 1 (so far as concerned train No. 71) "and watch out for anything that would keep the train from being delayed (in getting out on time). We (the inspectors) had, of course, inspected them in the yard, but we kept our rights to see that nothing happened in switching that would cause trouble or would be apt to delay the final movement of the train."

The blue flag and blue light rule was as follows: "A blue flag by day and a blue light by night displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it; when thus protected it must not be coupled to or moved. Each class of workmen will display the blue signals and the same work-

men are alone authorized to remove them. Other equipment must not be placed on the same track so as to intercept the view of the blue signals without first notifying the workmen. When emergency repair work is to be done under or about cars in a train and a blue signal is not available, the engineman and fireman will be notified and protection must be given those engaged in making the repairs.''

Plaintiff testified that the observance of the blue flag or light rule depended ''entirely where the work was being done and what was being done,'' and excuses his failure to observe the rule on the ground that he had told Morgenthaler to look out for him and that he depended on Morgenthaler to do this. He further testified that to have put up the blue light to make the adjustment he was attempting when injured, would have delayed the train's getting away ''ten to fifteen minutes,'' and to the effect that such delay was to be avoided when it could be reasonably done. Also, he testified, in effect, that for the adjustment he was attempting to make, when injured, it was not necessary to put up the blue light, and this for the reason that he called Morgenthaler's attention to what he was going to do and depended on him to keep a lookout. Plaintiff introduced three witnesses (Meyer, Milner and Pohlmann) in rebuttal. These witnesses were former employees of defendant at the Baden yards. Meyer testified that he had worked for defendant about 14 years as car inspector and repairer; that he was familiar with making up train No. 71; that when light repairs were made, if the blue flag or light was not up ''a trainman wouldn't go and put it up, because if the train was late the trainman would have to answer for it good and proper;'' that he had a talk with the yardmaster ''about putting up blue flags and delaying trains and this and that,'' and that the yardmaster said, ''I didn't tell you fellows not to put up any, but these trains are going out of here on time, better get out.''

Milner testified that he was in the employ of defendant eleven years, and that during the eleven years he was yardmaster in the Baden yards ''for about nine years;'' that he ceased working for defendant in 1928; that he was thereafter at these yards at intervals until 1933; that he saw no change ''with reference to how the blue flags were used'' from the ''method in 1925.'' Milner further said that it was not the duty of the switchman to put up the blue flag or light; that such duty was on the carmen (inspectors); that the blue flag or light was ''put out after we were through with the train (that is, after the train was assembled); after we were through with the switching, then we would tell them they could put out their blue light, and have it'' (the train). At the time plaintiff was injured all the cars to be in train No. 71, had not been assembled on bridge track 1. Pohlmann testified that he had worked for defendant for ''over ten years;'' that he quit August 19, 1933 (plaintiff

was injured September 1, 1933); that he was car repairer. "Q. Did you assist in making up No. 71 there? A. Yes, I repaired cars on it, when the cars come up from the bridge there. Q. Now, with reference to light repairs, did you do that kind of work? A. They called them light repairs. Most of them was heavy, though. Q. And what was the practice during all the time you were there with reference to using the blue flag or making light repairs when you were making up 71? A. Didn't use them." On cross-examination Pohlmann testified: "Q. Do you mean to say there were no blue lights used there at night when trains were being made up? A. There was no time for it. Q. Do you mean to say there were no blue lights used on the merchandise train (No. 71) at night and on the cars that came in from the Terminal Railroad Company? A. May at some time. Q. While they were being inspected? A. I couldn't say as to that."

Morgenthaler denied having had any such conversation with plaintiff as plaintiff claimed. He admitted that he had a talk with plaintiff just a short time before plaintiff was injured, but he says that this talk was about a carload of "sucker rods" and that he merely asked plaintiff if he knew "how they (the rods) worked." Morgenthaler said that plaintiff explained to him how these rods were used in an oil field. (And plaintiff admits that he and Morgenthaler talked about the "sucker rods.") Morgenthaler further said that he did not know that "anything was wrong with the knuckles on the north end of the New York Central car, or the south end of the Chicago Western car." (Plaintiff was injured between these cars); that after plaintiff was injured he (Morgenthaler) coupled these cars together and "did not see anything wrong with them." Morgenthaler said that "all repairs and inspections and oiling and coupling up air was done after the train was made up;" that is, as to train No. 71, after it was assembled on bridge track 1. Morgenthaler also said that the blue flag or light was put up even in minor repairs. T. W. Wilson, a member of the switching crew, when plaintiff was injured, testified that in case a defect in a car was found, and although it would not require much time to repair, the blue flag or light rule was supposed to be observed. Vogel, foreman of the switching crew, when plaintiff was injured, and who had worked in the Baden yards fourteen years, testified that he never at any time told plaintiff that "it wasn't necessary for him to put up the blue light or the blue flag on cars, where he was going between the cars. Q. I will ask you to state what, if anything, you said to the men, or to him, with reference to enforcing the blue light rule and the blue signal rule. A. I impressed on all the men there that we expected them to use the blue flag or blue light, as the case may be, for their own protection. . . . Q. Well, I will ask you this question: If switching operations were going on

to make up train 71 on the night of September 1, 1933, and the switching operations hadn't been completed, cars were being kicked in onto bridge 1 so as to make up that train 71, would the car inspector have any duties in between those cars while that operation was going on? A. I wasn't there when 71 was made up on the night of September 1st. All I can say is what they are supposed to do, and what I have seen them do. While they are making up the train nobody does any work on the car. Invariably they stay in the field until it is done. Then, when it is made up, the blue light or flag, whatever it may be, is put up and they do whatever is necessary then. Q. Would he have anything to do between the cars on 71 while it was being made up and the switching operations are in progress? A. While the cars are moving he couldn't do anything between them. Q. Well, would he have any duties in there, would he have a right to go in there? A. No, sir; not that I know of.''

R. V. Kelly, yardmaster when plaintiff was injured, testified: ''Q. Now, did you ever tell Mr. Perry at any time that it wasn't necessary for him—that you didn't want that blue flag rule enforced? A. No, sir. Q. And that he should work on cars without the protection of the blue signal? A. No, sir. Q. Did you ever at any time tell him that? A. No, sir. Q. Or issue any orders to that effect? A. No, sir.'' There was what was called a safety committee or council and the purpose of this committee, according to plaintiff, who was a member, was ''to carry out the safety program; in other words, to see that things were done safely.'' Plaintiff testified that two or three years prior to his injury he had a controversy about the blue flag rule; that he took the matter up with the safety committee and that ''they told us at that time that in doing that work we should not use the blue flag, because that wasn't a play yard, and it wasn't necessary to use blue flags under those circumstances at all, when we were coupling hose or such things, but just to watch out or get somebody to watch for us during those periods;'' that Golding (on the committee) ''laid down the conditions where he said it would be necessary to use the blue flag; and ''I think Mr. Smith (a member of the committee) was there at that time.'' J. F. Smith testified that he was a member of this committee from 1919 to 1931; that no other Smith was on the committee; that he did not state to plaintiff or anyone that ''it wasn't necessary for them to use the blue light or blue flag rule . . . in protecting themselves while working on cars.'' E. P. Golding testified that he worked (out of Dallas, Texas) from 1924 to 1931, in the safety department of the defendant; that he was a ''representative in the field;'' that his general duty was ''promotion of accident prevention;'' that he had attended safety meetings at the Baden yards in St. Louis. ''Q. Did you ever attend any meeting at the Baden yards at which you stated that the blue flag rule

was not to be enforced? A. No. sir. Q. What was your attitude with respect to that rule, as to whether it should be enforced or not? A. Well, we discouraged the violation of it whenever it came up at any meeting. In fact, that was one of the duties of our department, was to discourage any rule violation where there was personal injury involved. Q. And insist on the observance of the rule? A. Absolutely.''

Walter Lloyd testified that he was a car inspector for defendant and was on duty part of the night plaintiff was injured; that after plaintiff's injury he (witness) examined the couplers of the cars between which plaintiff was injured and found nothing wrong with them. ''Q. Was there anything bent or broken or worn about them? A. No, sir, nothing bent, nothing worn, wasn't out of contour.''

The assignment based on the refusal of defendant's peremptory instruction for a directed verdict is based on three contentions, viz.: (1) That there was no substantial evidence that defendant's agent, Morgenthaler, ''made a promise and agreement not to move or kick any cars on track bridge 1 until plaintiff had finished his work about the couplers of the two cars that were separated;'' (2) that the failure of plaintiff to put up the blue light before going between the two cars was a known violation of the blue light rule and was, as a matter of law, the sole proximate cause of plaintiff's injury; and (3) that the danger of going between the cars under the circumstances was so open and obvious that an ordinarily prudent person would have seen and appreciated the danger, and that plaintiff therefore assumed the risk.

It is apparent from the evidence set out, supra, relative to the conversation between plaintiff and Morgenthaler, that Morgenthaler did not in terms *promise* to keep the lookout upon which plaintiff relied, but plaintiff says that the plain inference, from the conversation and the conduct of Morgenthaler immediately thereafter, if believed by the jury, was sufficient to warrant the jury in finding that Morgenthaler promised and agreed to keep the lookout. As stated, plaintiff testified that he asked Morgenthaler ''if he would watch for me until I looked and seen how this coupler was or what was the matter with it?'' that thereupon Morgenthaler ''stepped over the track far enough so he could get a clear vision;'' that from where plaintiff was standing he could not see the head end (north end) of the track ''because of the cars ahead of me there;'' that by ''his (Morgenthaler's) having stepped back, naturally I assumed he was watching for me there;'' that he then asked Morgenthaler, ''How does that look up there?'' and that Morgenthaler said, ''Well, the engine is going in the bridge yard.'' Plaintiff, upon this answer, according to his evidence, went in between the cars and was injured.

■ Under the applicable rule as to favorable evidence and reasonable inferences deducible, when measured by a demurrer to the evidence, we are of the opinion that the question as to whether plaintiff had the right to rely on Morgenthaler keeping the lookout was for the jury. [Johnson v. C. & E. I. Ry. Co., 334 Mo. 22, 64 S. W. (2d) 674, l. c. 676; Kamer v. M. K. & T. Railroad Co., 326 Mo. 792, 32 S. W. (2d) 1075; Hardin v. Ill. Cent. Railroad Co., 334 Mo. 1169, 70 S. W. (2d) 1075, l. c. 1084; Gunning v. Cooley, 281 U. S. 90, 50 Sup. Ct. 231, 74 L. Ed. 720.]

The Kamer case, supra, is quite similar, on the facts, to the present case. That case concerned the same railroad yards as involved here and the same agent, Morgenthaler. On the occasion of Kamer's injury, Morgenthaler was foreman of the switching crew, while on the occasion of the present plaintiff's injury, Morgenthaler was "field man" of the switching crew. In the Kamer case the plaintiff was an air brake inspector. Violation of the blue light rule was involved in that case. The facts of the Kamer case are stated in the opinion thus: "After completing his work on train No. 93, on track 5, plaintiff and some other men went to the inspectors' shanty near the north end of the yards, where some of the men were eating a lunch. Plaintiff made out his card, or report, as to train 93, and then went over to track 5, to get the yard hose, blue lights and other equipment used in the inspection of train No. 93. These lights and equipment were placed near track 1 so as to be ready for use during the inspection to be made of train No. 73, after the cars in that train should be assembled and coupled. The plaintiff testified that as he came back from track No. 5, and was near the north end of track No. 1 and near the shanty, he met Mr. Morgenthaler, who was the switch foreman, and that Morgenthaler directed him to go down to a certain car standing on track No. 1, and see to the knuckle-lock, which was not operating. Asked to state what Morgenthaler said to him, plaintiff answered: 'Why, he gave the number of the car, and he said that on the south end of it the knuckle-lock was not operating, and for me to go down and see it, and I asked him whether to put the blue light out and he said, 'No, that will bottle up the north end.' He said, 'We have several gaps,' and he said, 'I will take care of you, and I won't shove them down hard enough so as to bother you at all.' Plaintiff in response to the instruction given by Morgenthaler went south along track 1, to see about the knuckle-lock. He passed along by twelve cars, standing together on that track. South of these twelve cars, at a distance of four or five car-lengths, were two more cars on track 1, and several car-lengths further south were a number of other cars on track 1. The south one of the two cars mentioned, was the car to which Morgenthaler directed the plaintiff. These were all cars which were to be part of train No. 73. The plaintiff said that about the time he

'got down there and with his left hand had got hold of the pin rod to lift the knuckle-lock' he was hit and hurt. The car at which he was beginning his inspection was suddenly moved forward from the impact of cars moved against the twelve cars, by. the switching crew. The wheel of the car at which he was engaged, passed over plaintiff's left leg.''

It is true that in the present case Morgenthaler was not foreman of the switching crew and that he did not *direct* plaintiff to do anything. The Federal Employers' Liability Act (45 U. S. C. A., sec. 51) makes defendant liable for injury to an employee ''resulting in whole or in part from the negligence of *any* of the officers, *agents,* or employees of such carrier.'' (Italics ours.) The fact that Morgenthaler was not the foreman, in the present case, and gave no directions, will not absolve defendant, because he, Morgenthaler, was an *agent* and *negligent,* if the facts occurred as plaintiff testified, and the verdict establishes the facts as given by plaintiff.

█ Was the failure of plaintiff to put up the blue light the sole proximate cause, as a matter of law, of plaintiff's injury? In support of this contention defendant cites Francis v. Kansas City, St. Joseph & Council Bluffs Railroad Co., 110 Mo. 387, 19 S. W. 935; Yoakum v. Lusk (Mo. App.), 223 S. W. 53; Flack v. A., T. & S. F. Ry. Co., 285 Mo. 28, 224 S. W. 415; Great Northern Ry. Co. v. Wiles, 240 U. S. 444, 36 Sup. Ct. 406, 60 L. Ed. 732; Davis v. Kennedy, 266 U. S. 147, 45 Sup. Ct. 33, 69 L. Ed. 212; Unadilla Valley Railroad Co. v. Caldine, Adms., 278 U. S. 139, 49 Sup. Ct. 91, 73 L. Ed. 224; Frese, Admx., v. C. B. & Q. Railroad Co., 263 U. S. 1, 44 Sup. Ct. 1, 68 L. Ed. 131 (see same case, 290 Mo. 501, 235 S. W. 97); Paster v. Pennsylvania Railroad, 43 Fed. (2d) 908; Unadilla Valley Railroad Co. v. Dibble, 31 Fed. (2d) 239; Southern Ry. Co. v. Hylton, 37 Fed. (2d) 843; Central Ry. Co. of N. J. v. Young, 200 Fed. 359.

All the cases cited on the violation of the blue light rule (under the facts presented), denied recovery because of rule or order violation. We do not deem it necessary to analyze these cases here. The Francis, Yoakum, Flack, Great Northern v. Wiles, and Davis v. Kennedy cases were analyzed in the Kamer case, supra. In none of these cases was the excuse for a rule violation such as here. In view of the evidence set out, supra, as to the observance of the blue light rule, in defendant's yards when an employee was doing the character of work plaintiff was attempting to do when injured, we cannot say, as a matter of law, that plaintiff's failure to put up the blue light was the sole proximate cause of his injury. [Kamer v. M.-K.-T. Railroad Co., supra; Yost v. Union Pac. Railroad Co., 245 Mo. 219, 149 S. W. 577; Johnson v. C. & E. I. Ry. Co., supra; Finnegan v. Mo. Pac. Ry. Co., 261 Mo. 481, l. c. 504, 169 S. W. 969; Dahlen v. Hines, 275 Fed. 817.]

■ Did plaintiff, as a matter of law, assume the risk? We think that Kamer v. M.-K.-T. Railroad Co., supra, is decisive on this question, and it is not necessary to consider the question at length. We have already ruled that the question of defendant's negligence (through its agent Morgenthaler) was a question for the jury. It is conceded that Morgenthaler was defendant's agent. We think the question of assumption of risk is answered in the Kamer case. In ruling the assignment in that case that the plaintiff assumed the risk the court (326 Mo. 792, l. c. 803, 32 S. W. (2d) l. c. 1081) said: "It is urged that the demurrer should have been sustained on the ground that plaintiff assumed the risk; that the danger of going between the cars, under the circumstances, was open and obvious, and respondent knew the danger was so open and obvious that an ordinarily prudent person would have seen and appreciated it. . . . If this case must be considered solely in view of the rule requiring the setting out of the blue light, and of plaintiff's knowledge of that rule, and of knowledge on his part that a train was being made up on track 1, and cars would likely be switched upon that track, and must be considered without reference to any custom or practice in the yards as to the particular kind of work plaintiff was directed to do under the circumstances, and without reference to any custom or practice as to protecting the man engaged in such work, and without reference to any notice given, or knowledge that such work was to be done, or assurance of protection while it was being done, then it would have to be said that the danger of going between cars on that track was obvious; that defendant owed the plaintiff no duty to warn him or to refrain from taking cars on that track; that his injury was caused solely by his own negligence, and in going between the cars he assumed all the risks incident to such condition. . . . In considering the question of whether the plaintiff assumed the risk of the switch foreman's negligence in causing or permitting cars to be switched upon track 1 at the time he did, such negligence of the switch foreman, if any, is to be considered as if negligence of the defendant. Under the evidence in this case as to the custom and practice in respect to the kind of duty imposed upon plaintiff by the direction of the switch foreman, we cannot say as a matter of law that the plaintiff assumed the risk of the performance of that duty, or, say that in view of the custom and practice in respect to that particular form of work, and assurance of the foreman, the plaintiff assumed the risk incident to the negligent failure of the foreman to follow the custom and practice shown, and make good the assurance given. This is so, because, the direction was given to the plaintiff to be at a particular place for a specific duty, and the switching operations in charge of the switch foreman were

to be conducted with reference to the position of the plaintiff at the particular place, and with reference to his safety at that place."

We hold that the question of assumption of risk in the present case was for the jury, and that defendant's instruction for a directed verdict was properly refused.

■ Defendant challenges plaintiff's instructions 1. and 2 and complains on the refusal of its instructions E and D. Instruction 1 is challenged on the grounds (1) that there was no substantial evidence to support the theory of negligence submitted, and (2) that the instruction purported to cover the whole case, but omitted essential facts necessary to authorize recovery. Our ruling on the sufficiency of the evidence disposes of the first complaint on this instruction. As to the second ground of complaint defendant says that the instruction is bad in that (1) the jury was not required to find that defendant knew or by the exercise of ordinary care could have known that plaintiff was between the cars; (2) that the instruction failed to require a finding that plaintiff did not know that the cars were to moved; and (3) that the instruction did not require a finding of sufficient facts to justify failure to comply with the blue light rule. Also, it is contended that Instruction 1 "gave the jury a roving commission to find defendant guilty of negligence without specifying what particulars would constitute negligence." Instruction 1, in terms, does not specifically require a finding that defendant knew or by the exercise of ordinary care could have known that plaintiff was between the cars, but the instruction does require a finding that Morgenthaler "negligently failed to notify plaintiff of the intended movement" of cars onto bridge track 1. The same complaint that is here made against Instruction 1 was made on Instruction 3 in the Kamer case where it was held (326 Mo. 792, l. c. 805, 32 S. W. (2d) l. c. 1082) that "the finding that defendant under the circumstances was not in the exercise of ordinary care, and was guilty of negligence, is equivalent to a finding that defendant knew, or, in the exercise of ordinary care, could have known plaintiff was between the cars," citing Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 18 S. W. (2d) 408; Berberet v. Electric Park Amusement Co., 319 Mo. 275, 3 S. W. (2d) 1025, 61 A. L. R. 1269; Morton v. Hiram Lloyd Bldg. & Construction Co., 280 Mo. 360, 217 S. W. 831. Instruction 1 did not specifically require a finding that plaintiff did *not* know that the cars were to be moved, but it did require a finding that Morgenthaler "agreed not to move or kick other cars against the cars between which plaintiff was," and the instruction required a finding "that plaintiff relied upon the promise of one of defendant's switchmen engaged in making up said train, not to move any cars into track bridge 1 against the cars plaintiff was working at without notifying or warning plaintiff of the intended movement in bridge

track one of cars against the cars between which plaintiff was employed.'' We do not think that Instruction 1 was bad for failure to specifically require a finding that plaintiff did not know that the cars were to be moved.

Is Instruction 1 bad because it failed to require a finding of sufficient facts to justify failure to comply with the blue light rule? Failure to comply with the rule was an affirmative defense and was pleaded by defendant and was covered by defendants' Instruction 8 as follows: ''The jury is instructed that if you find and believe from the evidence that the rules of the defendant and the custom practiced in said yard required that, before plaintiff did any work at, about or between cars, he should place blue lights at the ends of said car or cars, and that plaintiff had knowledge of said rule and custom, and that plaintiff at the time in question had failed to so place said blue lights, and that defendant did not know that plaintiff was working about or between the cars, then your verdict will be for the defendant.''

A similar complaint as here was made in the Kamer case. There the court said (326 Mo. 792, l. c. 807, 32 S. W. (2d) l. c. 1083): ''The defense that the blue light rule was in force, and plaintiff knew it, and negligently disregarded it, and defendant did not know he was between the cars, was submitted under defendant's Instruction 6. Since the plaintiff's instruction authorizing a verdict submitted the elements necessary to recovery, and the defendant's instructions authorizing a verdict for defendant submitted the defenses pleaded, the plaintiff's instruction cannot be condemned as erroneous in not submitting those defenses,'' citing State ex rel. Jenkens v. Trimble et al., 291 Mo. 227, 236 S. W. 651; Heigold v. United Railways, 308 Mo. 142, 271 S. W. 773; Rawie v. C. B. & Q. Ry. Co., 310 Mo. 72, l. c. 97, 274 S. W. 1031.

We do not think that there is any substantial merit in the contention that plaintiff's Instruction 1 gave the jury a roving commission.

■ Plaintiff's Instruction 2 was on assumption of risk. Against the instruction it is charged that it does not define negligence and does not set out facts ''which must be found to constitute negligence.'' Also, it is contended that the instruction does not correctly state the law on the assumption of risk. It was not necessary to define negligence. If defendant desired such definition it should have offered an instruction defining the term. [Morris v. Portland Cement Co. et al., 323 Mo. 307, 19 S. W. (2d) 865, l. c. 877, and cases there cited.] The instruction did not purport to cover the whole case and did not direct a verdict. We think that the complaint against Instruction 2 is without merit.

■ Defendant complains on the refusal of its Instruction E. Instruction E was on the assumption of risk defense, but the trouble with this instruction is that it *assumes* that the blue light rule was

in force and must be obeyed, so far as concerned the making up of train No. 71. The instruction is as follows: "The Court instructs the jury that if you find and believe from the evidence that plaintiff was injured by going between certain cars in defendant's railroad yard at a time when he knew that a train was being made up upon said track, without having first placed blue lights at the ends of such cars and without notifying defendant of his intention so to do, and that the danger of going between said cars under such circumstances was known to plaintiff or was so open and obvious that a reasonably prudent person would have seen and appreciated the danger, then your verdict will be for the defendant." In ruling defendant's assignment on the refusal of its request for a directed verdict we hold that the question of the blue light rule as it affected the making up of train No. 71 was for the jury.

██ Instruction D, on the refusal of which defendant complains, was on the blue light rule and is as follows: "The jury is instructed that if you find and believe from the evidence that the rules of defendant which were in force in the Baden yards at the time plaintiff is alleged to have sustained injuries required that before plaintiff should do any work at night at, about or between cars, and that said rule applied even to slight inspections or repairs, he should place blue lights at each end of the cars, and that it was the practice and custom in said yards for the men working in said yards to comply with and follow said rule and custom, and that plaintiff knew of said rule and custom, then no employee had the right to violate said rule and custom or to direct plaintiff to go about or between cars without having first placed blue lights at the ends of the cars, and even if you find that plaintiff went in between the cars at the direction of one of the members of the switching crew at a time when there were no blue lights displayed as required by said rule and was injured as a result thereof, then your verdict will be for the defendant."

It seems reasonably plain that since Instruction 8 was given defendant was not prejudiced by the refusal of D.

██ Defendant makes complaint on the action of the trial court in permitting plaintiff to introduce evidence in rebuttal, which evidence, defendant says, belonged in plaintiff's case in chief. This complaint has reference to the evidence of Meyer, Milner and Pohlmann. Such procedure is usually within the sound discretion of the trial court and unless this discretion is abused we should not interfere. [Cento v. Security Bldg. Co. (Mo.), 99 S. W. (2d) 1. c. 5.] We do not think there was any abuse of discretion, and rule this assignment against defendant.

The judgment should be affirmed and it is so ordered. *Ferguson* and *Hyde,* C'C., concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.